1996 SD 26

**Jane KRUEGER, Tom Krueger and Krueger Excavating, Inc., Plaintiffs and Appellants,**

v.

**Oscar AUSTAD, Defendant and Appellee,**

and

**Richard Barnes, Defendant.**

**No. 19155.**

Supreme Court of South Dakota.

Argued Oct. 16, 1995.

Decided March 20, 1996.

---

David R. Gienapp and Chris S. Giles, Arneson, Issenhuth, Gienapp & Blair, Madison, for plaintiffs and appellants.

Steven W. Sanford, Cadwell, Sanford and Deibert, Sioux Falls, for defendant and appellee.

McKEEVER, Circuit Judge.

[¶ 1] Tom Krueger, Jane Krueger and Krueger Excavating, Inc. appeal from a decision granting summary judgment to Oscar Austad in actions based on libel, defamation and invasion of privacy. We affirm.

## FACTS AND PROCEDURAL HISTORY

[¶ 2] Krueger Excavating, Inc. is a South Dakota corporation owned at various times by one or more members of the Krueger family and at all times pertinent to this action by Tom Krueger and his wife, Jane Krueger. In early 1984, Tom transferred forty-seven shares of stock to Jane in an agreed transaction. This transfer resulted in Jane owning fifty-one percent of the stock in Krueger Excavating and Tom owning the remaining forty-nine percent. Jane was also named the president of the corporation as part of this transaction. According to Kruegers, the change in ownership interests and the naming of Jane as president were necessitated by Tom's assuming the role of president of another corporation, Asphalt Surfacing Co.

[¶ 3] The majority ownership of Krueger Excavating by Jane allowed her to qualify the corporation as a business eligible for the Disadvantaged Business Enterprise (D.B.E.) program.[1] On October 8, 1995, a local minority contractor contacted the Sioux Falls City commission and complained that several local contractors were forming "front corporations" to qualify for certification under the D.B.E program.[2] The complaint named a number of people and/or companies, including Tom Krueger, Jane Krueger and Krueger Excavating, as examples of the alleged circumvention of program requirements resulting in abuse of the D.B.E. program. City and state inquiries concerning the complaint created publicity concerning the D.B.E. program but did not result in any adverse action towards the alleged program abuses. In December 1985, the D.B.E. program was the subject of a newspaper article questioning the legitimacy of minority and women ownership of companies which qualified for the program.[3] Krueger Excavating was listed by the newspaper article as a business which qualified for the D.B.E. program due to Jane's majority ownership.

[¶ 4] In November 1984, Tom Krueger was elected as a South Dakota state senator. He defeated Richard Barnes in the general election. In the spring of 1986, Tom ran in the Republican primary election against Randy Austad, son of Oscar Austad, for re-election to his senate seat. Jane served as Tom's advisor throughout the campaign.[4] During his campaign, Tom distributed campaign flyers which included a picture of his family.[5]

1. The Disadvantaged Business Enterprise program assures city and state construction projects will be awarded to minority and women-owned businesses submitting the lowest bid on the project. The program was adopted by the city of Sioux Falls on March 26, 1984. Krueger Excavating became eligible for the Disadvantaged Business Enterprise program upon application and approval by the State of South Dakota and the City of Sioux Falls.

2. The complaining contractor alleged that "front corporations" were being formed by the transfer of controlling stock to a member of the corporation qualified as a minority for purposes of the D.B.E.

3. On December 2, 1985, an article appeared in the Sioux Falls Argus Leader titled "Minority groups question company's legitimacy." This article listed Krueger Excavating among the companies which qualify as women-owned businesses for purposes of participating in the Disadvantaged Business Enterprise program.

4. During his deposition, Tom Krueger testified:

 Q: Who were your campaign advisors at that time?
 A: Jane was probably my best and biggest advisor....

5. The campaign flyers distributed by Tom characterized him as a family man and stated, "Some of Tom's most enthusiastic supporters are his wife Jane and his children, Christopher, 16, Tenley, 10. They know he is active, involved and a good decision maker."

On April 27, 1986, Jane was featured in a Sioux Falls Argus Leader article highlighting her success as the president of Krueger Excavating.

[¶ 5] On May 9, 1986, Richard Barnes' letter to the editor of the Argus Leader was printed. This letter stated:

It was interesting to see the attention given to Jane Krueger in the April 27 issue of the Argus Leader, titled "She built her reputation in construction business." The article made it sound as though she had, through her own skill and initiative, invested in, founded, developed, expanded and created Krueger Excavating.

Such is not the case.

Although Jane Krueger may be a very nice person and well known in the community, it is also well known that her husband, Tom Krueger, transferred ownership of a business inherited from his father to his wife so they could have their family business qualify for a share of government business allocated as a Disadvantaged Business Enterprise. A little investigative journalism would have discovered that this move took place within the last two years. There is a real need for government to be supportive of businesses that are owned by women and minorities. But the intent of that law was not designed to throw government dollars at established businesses who technically alter family names at the top of the company letterhead.

We would rightfully be angry with someone who misrepresented their income to get food stamps, thus taking food from those who are hungry. We should be equally upset with those who circumvent business from companies that are truly disadvantaged.

As the Republican state senator from District 14, Tom Krueger should have a sense of concern for the public good that goes beyond his own self-interest. He should probably have more respect for the law, also.

Following Barnes' letter to the editor, Oscar Austad facilitated the publication of a letter to the editor in the Argus Leader by M.I. Stahl on May 23, 1986. Austad wrote the letter, furnished the letter to Stahl for her reading and signature and delivered the signed letter to the Argus Leader office so it could be published as a letter to the editor. The Stahl letter stated:

I read with interest the letter that Rich Barnes submitted dealing with Krueger Excavating and how ownership of that company was transferred to his wife so they could get jobs as a disadvantaged business enterprise.

I really wasn't concerned, however, until I thought about how easy it is for people in power, like Sen. Tom Krueger, to misuse the law to their own benefit. When I thought about how upset I become when people deceive the system to get food stamps they're not entitled to, I really become irritated to think that one of our state senators would do such a thing to get more business for himself and take away potential jobs from the more deserving.

The Argus article on Jane Krueger said that about 10 percent of their business came from the disadvantaged business enterprise status. I think they would do well to take the profits from that 10 percent and turn it over to charity.

Jane Krueger responded to the letters with a May 29, 1986 letter to the editor in the Argus Leader denying her participation in Krueger Excavating was only to facilitate qualification for the D.B.E. program and accusing Richard Barnes and "the Austads" of inappropriate politics.

[¶ 6] Following the publication of the letters, Kruegers brought suit against Barnes [6] and Oscar Austad alleging libel, defamation and invasion of privacy as a result of the publications. On June 23, 1987, Austad's motion for summary judgment was denied. Following the denial of the motion, discovery took place and Austad renewed his motion for summary judgment. Kruegers appeal the grant of this motion for summary judgment to Austad.

---

6. Richard Barnes is a named defendant in this action, however, he has not made a motion for summary judgment and is not a party to this appeal.

## STANDARD OF REVIEW

 [¶ 7] In reviewing a grant of summary judgment, we must determine whether the moving party has demonstrated there is no genuine issue of material fact in dispute and he is entitled to judgment as a matter of law. *Nelson v. WEB Water Dev. Ass'n, Inc.,* 507 N.W.2d 691, 693 (S.D.1993); *Wilson v. Great Northern Ry. Co.,* 83 S.D. 207, 212, 157 N.W.2d 19, 21 (1968). Evidence should be viewed in the light most favorable to the nonmoving party, and reasonable doubts should be resolved against the moving party. *Id.* The moving party has the burden of proof. *Hamaker v. Kenwel–Jackson Machine, Inc.,* 387 N.W.2d 515, 517 (S.D.1986). Summary judgment is appropriate to dispose of legal questions, not factual questions. *Id.*

 [¶ 8] The standard of review for libel suits brought by public officials or public figures is different from that of traditional summary judgment review. *Janklow v. Viking Press,* 459 N.W.2d 415, 419 (S.D.1990) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In actions for libel where the plaintiff is a public official or a public figure, the trial judge's summary judgment inquiry is "whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Janklow v. Viking Press,* 459 N.W.2d at 419 (citing *Anderson,* 477 U.S. at 255–56, 106 S.Ct. at 2514, 91 L.Ed.2d at 216). In order for a public official or public figure plaintiff to survive a motion for summary judgment, he must prove "the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Wollman v. Graff,* 287 N.W.2d 104, 106 (S.D. 1980) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964)). The public official or public figure plaintiff "has a much greater burden of proof, not only at the trial level, but at the summary judgment stage." *Janklow v. Viking Press,* 459 N.W.2d at 419.

## ANALYSIS

[¶ 9] Kruegers claim Austad caused defamatory statements to be published in the Ar-

gus Leader which resulted in libel and defamation to their reputation and their business. Austad contends Kruegers are public figures by virtue of Tom's political office, the publicity concerning Jane's participation in business ventures, Jane's participation in Tom's campaign and Krueger Excavating's participation in a controversial government program; therefore, Kruegers must demonstrate actual malice on the part of Austad by clear and convincing evidence in order to prevail on their claims. *Anderson,* 477 U.S. at 244, 106 S.Ct. at 2508, 91 L.Ed.2d at 209 (citing *New York Times Co. v. Sullivan,* 376 U.S. at 279–80, 84 S.Ct. at 725–26, 11 L.Ed.2d at 706); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 162, 87 S.Ct. 1975, 1995, 18 L.Ed.2d 1094, 1115 (1967) (Warren, C.J., concurring), *reh'g denied,* 389 U.S. 889, 88 S.Ct. 11, 19 L.Ed.2d 197 (1967); *Nelson,* 507 N.W.2d at 697.

### [¶ 10] I. Public figure determination.

 [¶ 11] The determination of whether a person is a public figure for the purposes of a libel action is a question of law for the trial court. *Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597, 606 (1966); *Nelson,* 507 N.W.2d at 697.

 [¶ 12] Public officials and candidates for public office, by their very nature, are public figures for First Amendment purposes. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 344, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789, 808 (1974). "An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs." *Id.* Public officials and candidates for public office thrust themselves into public concerns in order to influence their resolution. Because politicians are intimately involved in the resolution of matters of public concern and because politics occupies a special place within the First Amendment, "[a]nything which might touch on a candidate's fitness for office is a matter of public concern vital to our system of democratic elections." *Briggs v. Channel 4, KGBT,* 739 S.W.2d 377, 378 (Tex.Ct.App. 1987). *See also Monitor Patriot Co. v. Roy,* 401 U.S. 265, 275, 91 S.Ct. 621, 626, 28 L.Ed.2d 35, 43 (1971); *Ocala Star–Banner*

*Co. v. Damron*, 401 U.S. 295, 300, 91 S.Ct. 628, 632, 28 L.Ed.2d 57, 62 (1971).

■ [¶ 13] Tom's tenure as a state senator and his bid for re-election to that position place him squarely within the definition of a public figure for First Amendment purposes. As a candidate for re-election, Tom voluntarily subjected himself to the scrutiny and criticism of voters and opponents. Questions concerning his qualifications for public office, including his association with a corporation qualified to participate in a controversial public business program, fall within the category of comments protected by the First Amendment. "[A] profound commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes sharp attacks on government and public officials" is necessary to guarantee the survival of the democratic system. *New York Times*, 376 U.S. at 270, 84 S.Ct. at 721, 11 L.Ed.2d at 701. The very essence of the First Amendment encourages the exchange of ideas and opinions, especially as to political issues and controversies, as a check on the government and a viable option for obtaining the truth necessary to ensure fair government. Erroneous statements are inevitable in the facilitation of free political debate because "[t]o persuade others of his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement." *Id.* at 271, 84 S.Ct. at 721, 11 L.Ed.2d at 701. Therefore, candidates such as Tom Krueger must expect commentary and criticism concerning his qualifications because "the people of this nation have ordained in light of history, that, in spite of the probability of excesses and abuses, [free speech is], in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy." *Id.*

■ [¶ 14] An ordinary citizen can also be transformed into a public figure.

[Public figures are] those who attain this status [by assuming] roles of special prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classified as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issue involved. *Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808. However, participation in public affairs or holding a role of prominence does not, in and of itself, automatically transform an ordinary citizen into a public figure. Nor does simply receiving public funds make an ordinary citizen a public figure. *Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411, 431 (1979). Rather, in determining whether an ordinary citizen has become a public figure, "[t]he court must look to the nature and extent of the individual's participation in the controversy." *New Franklin Enterprises v. Sabo*, 192 Mich.App. 219, 480 N.W.2d 326, 328 (1991) (citing *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 166–67, 99 S.Ct. 2701, 2706–707, 61 L.Ed.2d 450 (1979)).

■ [¶ 15] The circuit court found Jane was a public figure by virtue of her connection with Tom,. the newspaper articles highlighting her success as a business woman, and her position as president of Krueger Excavating and the challenge to her eligibility to participate in the D.B.E. program. While each of these factors standing alone may not elevate Jane to the level of public figure, we agree with the trial court that the unique combination of Jane's participation in these various events makes her a public figure.

[¶ 16] The fact Jane is the wife of a political candidate, actively participated in her husband's campaign, allowed her endorsement and photograph to be used in campaign literature, sought publicity concerning her prominence as a businesswoman and participated in a controversial government program combine to make Jane a public figure for First Amendment purposes. As one of Tom's most enthusiastic supporters and his campaign advisor, Jane placed herself in a position to influence the resolution of public concerns. Furthermore, as president of a prominent business, Jane sought and was awarded state and city contracts for excavating work.

[¶ 17] Jane thrust herself into the public controversy surrounding the D.B.E. program when she chose to compete for the program's contracts, see *Continental Cablevision, Inc. v. Storer Broadcasting Co.*, 653 F.Supp. 451, 460 (D.C.Mass.1986) (holding that a company that competed for business thrust itself into a public controversy surrounding the business), and when she chose to grant interviews to discuss her business practices and highlight her business acumen. The nature, extent and combination of all these actions thrust Jane into a position of prominence in the community and placed her in the middle of the public concern surrounding both her husband's candidacy and her business' participation in a controversial public program.

[¶ 18] This Court has held a corporation can qualify as a public figure. *Nelson*, 507 N.W.2d at 697. A corporation becomes a public figure in the same manner an ordinary citizen achieves such status. *See Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808; *Nelson*, 507 N.W.2d at 697. The record reveals the D.B.E. program was a matter of public concern as reflected in the newspaper articles concerning the program, the public documents and inquiries necessary for participation in the program and the fact the program allocated state and city funds. The award of public funds is a subject deserving serious public concern and debate. Qualifications for receipt of such funds may be subject to public scrutiny and comment when controversy surrounds the award. *McDowell v. Paiewonsky*, 769 F.2d 942, 949 (3rd Cir.1985).

[¶ 19] Krueger Excavating voluntarily thrust itself into this controversial program by applying for and receiving the benefits of the D.B.E. program. While receipt of public funds alone does not qualify Krueger Excavating as a public figure, *see Hutchinson*, 443 U.S. at 135, 99 S.Ct. at 2688, 61 L.Ed.2d at 431, participation in the D.B.E. program by a corporation with forty-nine percent ownership by a political candidate, the publicity concerning Jane's success as president of the corporation and the fact that the only stockholders of the corporation are public figures qualify Krueger Excavating as a limited purpose public figure for purposes of the D.B.E.

program and Tom Krueger's political campaign. *See McDowell*, 769 F.2d at 949 (holding an applicant is inevitably drawn into the public arena when application to receive public funds is made). *See also Nelson*, 507 N.W.2d at 697 (holding an ordinary citizen can be deemed a public figure for the limited range of issues in which the individual injects himself or is drawn into by a particular controversy).

[¶ 20] **II. Malice determination.**

[¶ 21] Because we have concluded Tom and Jane Krueger are public figures and Krueger Excavating is a limited purpose public figure, Kruegers have the burden of demonstrating by clear and convincing evidence that Austad acted with actual malice in the publication of the allegedly defamatory letters. *Nelson*, 507 N.W.2d at 697; *Janklow v. Viking Press*, 459 N.W.2d at 419.

> [A] court ruling on a motion for summary judgment [involving a public figure plaintiff] must be guided by the New York Times "clear and convincing" evidentiary standard in determining whether a genuine issue of actual malice exists—that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity.

*Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514–515, 91 L.Ed.2d at 217. *See also Nelson*, 507 N.W.2d at 697 (citing *Anderson* and *Janklow v. Viking Press* ). This standard requires an actual showing by the public figure plaintiff that the defendant knew the defamatory statements were false or acted with reckless disregard of the truth in publishing the statements. *New York Times*, 376 U.S. at 287–88, 84 S.Ct. at 729–30, 11 L.Ed.2d at 710–11. To constitute actual malice, the public figure plaintiff must show the false publication was made with a "high degree of awareness of [its] probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133 (1964). The defendant must be shown to have "entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968).

In order to show reckless disregard, the public figure plaintiff must prove:

(1) libel by clear and convincing evidence;

(2) more than a defendant's failure to investigate;

(3) that the defendant entertained serious doubts as to the truth;

(4) that the defendant had a high degree of awareness of falsity; and

(5) that the defendant had obvious reason to doubt the veracity of the informant or the accuracy of his reports.

The first guideline is mandatory. The others are closely related to each other and will often be used in conjunction with one another.

*Janklow v. Viking Press*, 459 N.W.2d at 420. The plaintiff may also enter evidence which is probative of the defendant's state of mind before the publication by direct inquiry into the defendant's knowledge of falsity. *Id.* (citing *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979)).

[¶ 22] The trial court found the record void of clear and convincing evidence Austad published the defamatory letters with knowledge of their falsity or with reckless disregard of the truth. The deposition testimony that constitutes the record in this case indicates the letters reflect personal observations, reliance on public records assembled in the course of qualifying Krueger Excavating as a D.B.E. and conclusions and inferences drawn from previously published news articles in the Argus Leader concerning Tom Krueger, Jane Krueger, Krueger Excavating and the D.B.E. program. There is nothing to show Austad published the letters with knowledge of their falsity or with reckless disregard of the truth.

[¶ 23] Austad's comments were obviously made to cast the Kruegers in an unfavorable light, but not with the actual malice required by law. Without a showing of actual malice, Kruegers cannot sustain their claims of libel and defamation.

[¶ 24] **III. Opinion/fact determination.**

[¶ 25] The issue of whether the comments were opinion or fact has also been raised on appeal. Although we affirm the granting of summary judgment based on the public figure rationale, we will address the opinion/fact issue to give future guidance to the bench and the bar as this issue can arise independent of the public figure question. Opinion is protected even though it may be false. *Gertz*, 418 U.S. at 339–40, 94 S.Ct. at 3007, 41 L.Ed.2d at 805. False statements of fact, however, are afforded no constitutional protection. *Id.*

[¶ 26] The distinction between statements of fact and statements of opinion is made through the application of the four factor test established by the Eighth Circuit Court of Appeals in *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302–303 (8th Cir.1986), and cited by this Court with approval in *Janklow v. Viking Press*, 459 N.W.2d at 423. The four factors to be considered are: (1) specificity or precision of the statement, (2) verifiability, (3) literary context and (4) public context. *Id.*

Under the first factor of this test,

[t]he precision and specificity with which an assertion is made may reflect the extent to which it actually recites specific factual events. Specificity also goes to the singularity of a statement's meaning. Where a statement or phrase is susceptible of more than one meaning, we will not presume either that the phrase means what the plaintiff asserts it does or that it is factual where it can be understood as an opinion.

*Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1432 (8th Cir.1989) (citing *Letter Carriers v. Austin*, 418 U.S. 264, 283–84, 94 S.Ct. 2770, 2780–81, 41 L.Ed.2d 745 (1974)). *See also Janklow v. Viking Press*, 459 N.W.2d at 423. The language of Austad's alleged defamatory letters do not allow for only one meaning or interpretation. A number of the comments in the letters are applicable to all minority and women owned businesses. Other comments are general references to misrepresentations made by participants in government programs. These statements can be viewed in a number of ways and accordingly, they lack the specificity required to be characterized as facts.

[¶ 27] The second factor of the test considers the verifiability of the statements. Statements which cannot be verified do not qualify as facts. *Janklow v. Newsweek,* 788 F.2d at 1302; *Janklow v. Viking Press,* 459 N.W.2d at 423. Austad cannot verify Kruegers transferred stock in Krueger Excavating to qualify for the D.B.E. program. The letters attributed to Austad do not reveal details of the transaction which are so specific as to be mistaken for fact by the reader. Instead, Austad's letters are predicated on inferences, conclusions and assumptions drawn from various sources. While these inferences, conclusions and assumptions may be false, they are not presented in such a manner as to qualify as established facts.

[¶ 28] The literary context of the forum in which the defamatory statements took place must be examined as the third factor in distinguishing between opinion and fact. "Various considerations [of the literary context] include cautionary or qualifying language, language or style which signals opinion, the type of publication, the location of the statement or work within the publication, and the intended audience." *Price,* 881 F.2d at 1432. The letters containing the alleged defamatory statements appeared in the Letters to the Editor section of the opinion page of the Argus Leader. The placement of the letters on the opinion page is a strong indication the statements were intended as opinions and not as established facts. The placement also indicates the intended audience of these letters was readers of the opinion section of the newspaper. The published letters provided general qualifying language concerning the discussion of the Kruegers activities. Considered in their literary context, Austad's letters qualify as opinions, not facts.

[¶ 29] Consideration of the defamatory statements under the fourth factor, the public context, also places the statements in the opinion category. The letters published by Austad were published during an election primary. Debate over the qualifications of candidates for public office is necessary to aid voters in making an informed choice. The discussion of Tom's affiliation with a corporation participating in the D.B.E. program was relevant to voter's determination

of his qualifications for elected office. Discussion of the D.B.E. program was of great interest to the voting public, and "[i]t is difficult to conceive of a forum any more public than a political campaign." *Janklow v. Viking Press,* 459 N.W.2d at 424.

[¶ 30] Debate over political issues and the qualifications of political candidates on the opinion pages of newspapers during an election year is not a rarity, it is a necessity. In dealing with political discussions, we must be mindful of the sanctity given to free speech by our Founding Fathers:

> The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system. It is a prized American privilege to speak one's mind, although not always in perfect good taste, on all public institutions, and this opportunity is to be afforded for "vigorous advocacy" no less than "abstract discussion."

*New York Times,* 376 U.S. at 269, 84 S.Ct. at 720, 11 L.Ed.2d at 700 (citations omitted). It is of great importance that public figures and matters of public concern not be shrouded from criticism, discussion and the free exchange of ideas necessary for democracy to prevail.

[¶ 31] For the foregoing reasons, the statements contained in the published letters are opinions and are protected by the First Amendment guarantees.

[¶ 32] **IV. Invasion of privacy claims.**

[¶ 33] Kruegers also contend they suffered an invasion of privacy as a result of the publication of Austad's letters. An actionable violation of the right of privacy has been acknowledged by this court to be:

> The unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities, in such manner as to outrage or cause mental

suffering, shame, or humiliation to a person of ordinary sensibilities.

*Truxes v. Kenco Enterprises, Inc.*, 80 S.D. 104, 119 N.W.2d 914, 916 (1963) (citation omitted). For all of the reasons stated above, Kruegers and Krueger Excavating were engaged in activities which were of legitimate public concern as public figures. Accordingly, there has been no unwarranted invasion of their right of privacy capable of sustaining their claim.

[¶ 34] Because the Kruegers and Krueger Excavating are public figures within the context of First Amendment protection and they failed to show actual malice on the part of Austad in publishing the letters as required by law, the grant of summary judgment by the trial court is affirmed.

[¶ 35] *Affirmed.*

[¶ 36] MILLER, C.J., and AMUNDSON, GILBERTSON, and KONENKAMP, JJ., concur.

[¶ 37] McKEEVER, Circuit Judge, for SABERS, J., disqualified.

