# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

—————

No. 01-1048

—————

| | |
|---|---|
| John Doe, a minor, by his mother and next friend, Jane Doe, | * * * |
| Appellee, | * * |
| v. | * Appeal from the United States<br>* District Court for the<br>* Eastern District of Arkansas. |
| Pulaski County Special School District, | * * |
| Appellant. | * |

—————

Submitted: March 12, 2001

Filed: August 28, 2001 (corrected 8/29/01)

—————

Before HANSEN and HEANEY, Circuit Judges, and TUNHEIM[1], District Judge.

—————

HEANEY, Circuit Judge.

J.M. was expelled from the Pulaski County Special School District (PCSSD) based on certain writings he composed that allegedly threatened an eighth-grade

---

[1]The Honorable John R. Tunheim, United States District Judge, for the District of Minnesota, sitting by designation.

classmate. J.M., through his parents, challenged his expulsion in district court,[2] which concluded that J.M.'s composition had not been a true threat, and voided his expulsion. PCSSD appeals. The primary issue before us is whether the district court erred in its application of the "true threat" analysis. For the reasons discussed below, we affirm the well-reasoned decision of the district court.

I.  Background

The following facts were found by the district court and are uncontroverted on appeal. When he was in seventh grade, J.M. moved to Pulaski County, Arkansas and enrolled at Northwood Junior High School in PCSSD for the 1999-2000 school year. Throughout that school year, J.M. "went with" K.G., a classmate and member of his church. Sometime after the 1999-2000 school year, during summer vacation, K.G. "broke up" with J.M. because she wanted to spend time with another boy. Upset, J.M. wrote two drafts of a composition[3] at home. The compositions appear to be of the same genre as the violent, misogynistic, and profane lyrics of rap artists such as Eminem, Juvenile, and Kid Rock. Both versions of the composition contain references to killing K.G. J.M. did not intend that either version be delivered to K.G., and he did not deliver either version to K.G.

About a month before the 2000-01 school year began, J.M.'s friend, D., found one of the compositions in J.M.'s bedroom. J.M. first took his writing away from D., but then allowed him to read it. He refused to give D. a copy of the composition when D. requested one. Days after D. found the composition, K.G. and J.M. spoke on the phone at least two or three times. On one occasion, K.G. called J.M. to say that she

---

[2]The Honorable George Howard, Jr., United States District Judge for the Eastern District of Arkansas.

[3]The district court refers to J.M.'s writing at issue as a "composition," "letter," and "song" alternately, and we adopt the same terminology to facilitate the analysis.

had heard about the contents of the "songs" that he had written, and asked if she could read them. J.M. refused the request. J.M. told her that the compositions contained statements about killing her.

A week before school started, and upon K.G.'s request,[4] D. visited J.M.'s home a second time and took one of the compositions without J.M.'s permission. J.M. did not know that the letter was missing until sometime after D. had taken it. D. called K.G. and said that he had the letter, then read her portions of it. She asked D. to bring her the letter.

On the second day of school, D. gave K.G. the letter. According to K.G.'s testimony, one of K.G.'s friends notified the school resource officer, James Kesterson, that K.G. was worried about the contents of the letter. He reported the letter and the persons involved to the school administrators. After meeting with J.M., D., and K.G., Bob Allison, the principal, recommended that J.M. be expelled for one year for one count of "terroristic threatening" as described in Rule 36 of the PCSSD Student Handbook for Student Conduct and Discipline.[5]

---

[4]K.G. testified at trial that she "talked to [D.] once after probably the second phone call I had with . . . [J.M.] and I asked him about a letter. I asked him if he knew anything about it and he said no, and I asked him if he was going to [J.M.'s] house anytime soon and he said yeah, I'm going sometime this week. I said do you think you could find it for me and he said yes." (T. at 268).

[5]Rule 36. Terroristic Threatening - Threats of Serious Physical Injury or Property Damage/Threats to Teachers/Staff

Students shall not, with the purpose of terrorizing another person, threaten to cause death or serious physical injury or substantial property damage to another person or threaten physical injury to teachers or to school employees . . . . Student will be suspended immediately and recommended for expulsion.

On August 23, 2000, J.M. and his parents attended a conference with Dr. Welch, the Director of Student Services for PCSSD, and Mr. Calhoun, the Assistant Principal. Dr. Welch recommended that J.M. be suspended for one semester and that he attend an alternative school, Alpha Academy, during the period of his suspension. J.M. attended the alternative school from August 29 to September 12, 2000. He and his parents appealed the suspension recommendation to the PCSSD Board on September 12, 2000. Outraged at J.M.'s conduct, the Board extended J.M.'s expulsion to the end of the school year and denied him the right to attend Alpha Academy.

J.M., through his parents, filed suit in district court against PCSSD, claiming that the expulsion violated his rights. On November 22, 2000, the district court held that J.M.'s composition was not a true threat because the letter was taken from his home and presented to K.G. without his permission, and because the contents of the writing did not amount to an imminent or immediate threat. Because the court found that J.M.'s writings were protected speech, it ordered PCSSD to terminate J.M.'s expulsion. PCSSD appeals.

II. Discussion

The district court properly noted that threats of physical violence are not protected by the First Amendment Watts v. United States, 394 U.S. 705, 707 (1969); a true threat, however, must be distinguished from constitutionally protected speech. Id. at 707. If J.M.'s statements do not amount to a true threat, his speech is protected because he wrote the compositions at home, and the school district cannot silence a student's personal expression that occurs off campus. See Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988) ("A school need not tolerate student speech that is inconsistent with its basic educational mission, even though the government could

4

not censor similar speech outside the school." (quotation and citation omitted)); Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 688 (1986) (Brennan, J., concurring) (explaining that student's profane speech would probably not be grounds for punishment if given outside school setting).

The Supreme Court has not established a bright-line test for distinguishing a true threat from protected speech. In United States v. Dinwiddie, 76 F.3d 913, 925 (8th Cir. 1996), however, we outlined a number of factors to consider when determining whether a statement constitutes a true threat: the reaction of the recipient of the threat and of other listeners, United States v. J.H.H., 22 F.3d 821, 827-28 (8th Cir. 1994); whether the threat was conditional, United States v. Bellrichard, 994 F.2d 1318, 1321 (8th Cir. 1993); whether an objectively reasonable recipient would view the message as a threat, id.; whether the threat was communicated directly to its victim, id.; whether the maker of the threat had made similar statements to the victim in the past, United States v. Whitfield, 31 F.3d 747, 749 (8th Cir. 1994); whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence, id.; and whether the recipient of the alleged threat could reasonably conclude that it expresses "a determination or intent to hurt presently or in the future." Martin v. United States, 691 F.2d 1235, 1240 (8th Cir. 1982).

Incorporating many of these factors, the Ninth Circuit has established an objective test for determining whether a threat is a "true threat" falling outside the protection of the First Amendment: "whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." Lovell v. Poway Unified School District, 90 F.3d 367, 371 (9th Cir. 1996); United States v. Orozco-Santillan, 903 F.2d 1262, 1265 (9th Cir. 1990). Furthermore, "[a]lleged threats should be considered in light of their entire factual context, including the surrounding events

5

and the reaction of the listeners." <u>Lovell</u>, 90 F.3d at 371 (citing <u>United States v. Gilbert</u>, 884 F.2d 454, 457 (9th Cir. 1989).

Other Circuits have distinguished threats from protected speech as well. The Second Circuit explained in <u>United States v. Francis</u>, 164 F.3d 120, 122-23 (2nd Cir. 1999) that there is a threat where the communication "on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate, and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." (citing <u>United States v. Kelner</u>, 534 F.2d 1020, 1027 (2d Cir. 1976)(construing 18 U.S.C. § 875(c)). Similarly, the Sixth Circuit found that "[a]lthough it may offend our sensibilities, a communication objectively indicating a serious expression of an intention to inflict bodily harm cannot constitute a threat unless the communication also is conveyed for the purpose of furthering some goal through the use of intimidation." <u>United States v. Alkhabaz</u>, 104 F.3d 1492, 1495 (6th Cir. 1997).

Integrating Eighth, Ninth, Second, and Sixth Circuit precedent, and believing that the Ninth Circuit has most clearly articulated a concise standard for identifying a true threat, we ask whether a reasonable person would foresee that J.M.'s letter could be interpreted by K.G. as a serious expression of intent to harm her, and respond in the negative. J.M. wrote his composition in private, at home, during summer vacation. He did not send or show the composition to K.G., and only presented the letter to D. when D. discovered the letter in J.M.'s bedroom. Furthermore, J.M. refused to let D. make a copy of the composition. <u>Cf</u>. <u>United States v. Hart</u>, 212 F.3d 1067, 1072 (8th Cir. 2000) (parking Ryder truck in front of abortion clinic in aftermath of Oklahoma City bombing as public communication) (<u>cert</u>. <u>denied</u>, 121 S.Ct. 860 (2001); <u>Dinwiddie</u>, 76 F.3d at 925-26 (threatening death of physician at least fifty times with bullhorn); <u>Bellrichard</u>, 994 F.2d at 1321-22 ("As a general proposition, [intimidating]

correspondence . . . delivered to a person at home or at work is somewhat more likely to be taken by the recipient as a threat.").

In their phone conversations, K.G. and J.M. discussed the contents of the letter before K.G. saw the writing. Those conversations have not been preserved in the record, however, so we cannot ascertain the context within which J.M. explained the substance of his composition, nor K.G.'s reaction to the contents.

The record also fails to show that K.G. had any knowledge that J.M. had a history of acting violently at the time that K.G. became aware of the letter, nor is there evidence that suggests that J.M. had threatened to harm K.G. or anyone else in the past. Cf. Whitfield, 31 F.3d at 749 (concluding correspondence constituted true threat where victim had received over sixty letters threatening sexual assault; and victim knew defendant had engaged in felonious criminal conduct in past, had mental disorder, and had carried a gun); United States v. Lee, 6 F.3d 1297, 1303 (8th Cir. 1993) (per curiam) (sustaining jury's finding of threat based on witnesses' testimony regarding implicit message of cross-burning).

Other factors support our conclusion that J.M.'s composition does not constitute a true threat. The record shows that K.G. and J.M. peacefully participated in church activities together after K.G. became aware of the contents of the letter.[6] After J.M. was expelled, he approached K.G. and her mother at church, and apologized for his conduct. Finally, after an officer interviewed the students, the state prosecuting attorney decided not to take formal action against J.M. and closed the file.

---

[6]Linda Connett, a volunteer for the Stanfill Baptist Youth Group testified that after J.M. and K.G. "quit going together" that "[t]hey never acted like they were fighting or anything like that and still would be in the group together." (T. at 323). Joyce Ann Rogers, Youth Leader, also testified that K.G. and J.M. peacefully participated in church activities together on August 16 of that year. (T. at 329-33).

We are generally reluctant to interfere with the Board's discretion in its administration of student affairs. However, the court below astutely noted the unprofessional manner in which the Board conducted its review of J.M.'s expulsion:

> A number of Board Members relied on their own personal experiences, different from the facts of this case, which appeared to have influenced their decision. They also did not have access to relevant facts and witnesses, such as [K.G.] and [D.]. Furthermore they appear to have upheld the expulsion as punishment for [J.M.] appealing the decision. That is, a number of Board Members stated that the alternative school was good, and that [J.M.] should have accepted that punishment.

John Doe v. Pulaski County Special School District, No. 4:00CV00707 GH, slip op. at 5 n.3 (E.D. Ark. Nov. 22, 2000). Although we do not condone the appalling language that J.M. used to express his sense of loss and rejection, we believe that the Board's decision to expel J.M. and to eliminate other educational opportunities available to him in the district was unwarranted. Under the totality of the circumstances a reasonable person would not have foreseen that J.M.'s composition would have been interpreted by K.G. to communicate a serious expression of intent to hurt her.

## III. Conclusion

The district court did not err in holding that J.M.'s composition is protected speech rather than a true threat. We therefore need not reach the other issues raised by the appellant. The decision below is affirmed.

HANSEN, Circuit Judge, dissenting.

I respectfully dissent. I would answer the court's question (ante at 6) of "whether a reasonable person would foresee that J.M.'s letter could be interpreted by [K.G.] as a serious expression of intent to harm to her" in the affirmative. In my view, the record shows that the young lady who was the target of the threats considered them to be very real; so real that she took to sleeping with the lights on. As for the communication of the threats directly between the two young people, my reading of J.M.'s testimony is that he did in fact tell K.G. in more than one telephone conversation about the letters and that they contained threats to kill her.

The district court unnecessarily dignified the disgusting document J.M. penned by calling it a "composition," as if it were something prepared for a creative writing class assignment. In the space of four handwritten pages, he used the f-word no fewer than ninety times, threatened four different times to kill his former girlfriend by lying in wait under her bed with a knife, and three times proclaimed that he would rape and sodomize her (using the absolute coarsest of language to describe how he would do so). The elected school board was in the best position to determine what scholastic sanction should be imposed on J.M. for communicating such a flagrant threat of serious bodily injury and death to another student in violation of Rule 36 of the school's student handbook.[7] Having reviewed the record, I conclude the district court erred when it overturned that decision and returned J.M. to the classroom. Accordingly, I respectfully dissent.

---

[1]Rule 36 states: "Students shall not, with the purpose of terrorizing another person, threaten to cause death or serious physical injury...to another person or threaten physical injury to teachers or school employees."

9

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.