651 N.W.2d 702 (2002)
2002 SD 113
The PEOPLE of the State of South Dakota in the Interests of C.C.H., Minor Child, and Concerning N.C.H. and M.C.H.
No. 22006.
Supreme Court of South Dakota.
Argued on February 12, 2002.
Decided September 4, 2002.
*704 Mark Barnett, Attorney General, Richard M. Williams, Assistant Attorney General, Pierre, for appellee.
Dana Hanna, Valentine, NE, for appellant C.C.H.
[¶ 1.] Justice ROBERT A. AMUNDSON delivers the majority opinion of the Court on Issue 1, which reverses the trial court's delinquency adjudication.
[¶ 2.] Acting Justice GORS delivers the majority on Issue 2, which reverses the trial court's child in need of supervision adjudication.
[¶ 3.] C.C.H., a minor child, was adjudicated delinquent pursuant to SDCL Chapters 26-7A and 26-8C and a child in need of supervision as defined in SDCL Chapter 26-8B. C.C.H. appeals this disposition. We reverse.

FACTS
[¶ 4.] On February 13, 2001, in response to a teacher's inquiry, C.C.H., an eighth grader in Winner, South Dakota, made threatening remarks regarding another student. Audrey Keierleber (Keierleber), C.C.H's Home Economics teacher, had noticed C.C.H. was behind on a class project, so she tried to assist him. C.C.H., however, refused to concentrate; rather, he stared across the classroom at B.C., another student. When Keierleber inquired into his actions, C.C.H. stated in a serious tone that he was angered by some of the students and that he wanted to kill B.C. Keierleber changed the subject and did not discuss C.C.H.'s comments with him. Later the same afternoon, Keierleber e-mailed middle school administrators the following message:
I am not sure what I should be doing. [C.C.H.] is in my 8th period FACS [home economics] class. When he is here he will not work for me. He wanted to [kill B.C.] and [S.] is irritating him. And the White Girls are looking at him. As a result he gets nothing done. I am open to suggestions. There is a potential explosion about to happen, and I want some way to deal with the problem ahead of time. Thanks for the help.
/s/ Audrey Keierleber
[¶ 5.] The following day, C.C.H. worked more productively in Keierleber's class, but at the end of the period, again, responded to a second teacher inquiry that he wanted to kill B.C. In response, Keierleber again wrote an e-mail to school administrators explaining that things went well, but that C.C.H. said he still wanted to kill B.C.
[¶ 6.] On February 15, 2001, school administration notified the Winner Police Department of C.C.H.'s statements to Keierleber. C.C.H. was charged with simple assault and two counts of disorderly conduct. After a court trial, the simple assault charge and one count of disorderly conduct were dismissed. The trial court found C.C.H. guilty beyond a reasonable doubt on the remaining charge and entered an order of disposition.[1]
*705 [¶ 7.] The court entered a judgment finding C.C.H. to be a delinquent child as defined by SDCL 26-8C-2.[2] The court further held that C.C.H. is a child in need of supervision (ChINS) as defined by SDCL 26-8B-2 even though the State did not submit a ChINS petition.[3]

STANDARD OF REVIEW
[¶ 8.] Our standard of review for the disposition of a delinquency finding requires us to ensure that "the State proved each element of the offense beyond a reasonable doubt." In Interest of A.W., 438 N.W.2d 557, 558 (S.D.1989). When reviewing the evidence, we will construe any inferences in favor of supporting the verdict. Id. See also In Interest of W.Y.B., 515 N.W.2d 453, 455-56 (S.D.1994). The State must prove the allegation made in a ChINS adjudication beyond a reasonable doubt, and this Court applies the clearly erroneous standard on review of the trial court's decision. In Matter of T.K., 462 N.W.2d 893, 895 (S.D.1990). "When an asserted error implicates an infringement of a constitutional right, we employ a de novo standard of review." State v. Dillon, 2001 SD 97, ¶ 12, 632 N.W.2d 37, 43.

DECISION
[¶ 9.] AMUNDSON, Justice, delivers the majority on Issue 1, which reverses the trial court's delinquency adjudication.
[¶ 10.] In addition to arguing that the elements of disorderly conduct have not been met,[4] C.C.H. argues that his threats were mere words of frustration *706 that were communicated privately to his teacher. Therefore, he contends his words were not criminal in nature, and constitute protected speech under the First Amendment.
[¶ 11.] We have previously analyzed First Amendment rights to free speech and the types of speech exempted from constitutional protection. See, e.g., In the Interest of S.J.N-K., 2002 SD 70, 647 N.W.2d 707 (2002) (finding First Amendment protection did not apply to student's vulgar language based on student's threatening behavior); State v. Hauge, 1996 SD 48, 547 N.W.2d 173 (discussing overbreadth and restriction on speech by restraining order); Krueger v. Austad, 1996 SD 26, 545 N.W.2d 205 (discussing First Amendment in a libel action). We have not, however, had the opportunity to address the "true threats" doctrine.
[¶ 12.] The United States Supreme Court has clearly announced that a "true threat" is not protected by the First Amendment. Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). In Watts, the United States Supreme Court determined that an individual should not be prosecuted for statements he made about killing the President at a political rally. The comments made, the Court held, were not threats under the particular facts of the case, and true threats "must be distinguished from what is constitutionally protected speech." Id. at 707, 394 U.S. 705, 89 S.Ct. at 1401, 22 L.Ed.2d 664.
[¶ 13.] In examining the true threats doctrine, it is obvious that courts have somewhat conflicting rulings regarding what constitutes a true threat. Some courts have held students' threatening words fall outside the realm of first amendment protection. See, e.g., Jones v. State, 347 Ark. 409, 64 S.W.3d 728 (2002) (holding a rap song from one classmate to another that described the killing of the recipient and her family constituted a true threat so that the First Amendment did not apply); In re A.S., 243 Wis.2d 173, 626 N.W.2d 712 (2001) (affirming adjudication of delinquency based on telling classmate a detailed plan of how he was going to kill and torture people at school). See also Svedberg v. Stamness, 525 N.W.2d 678 (N.D.1994) (finding a minor's "incessant teasing" and "harassment" of another minor was not protected speech pursuant to the "fighting words" doctrine). Other courts, however, have held students' threatening words fall within the realm of protected speech. In re Douglas D., 243 Wis.2d 204, 626 N.W.2d 725 (2001) (finding story written as a class assignment, which described the teacher's head being cut off, is protected speech under the First Amendment); Doe ex rel. v. Pulaski Co. Special Sch. Dist., 263 F.3d 833 (8thCir.2001) (holding eighth grader's composition discussing killing of classmate who broke up with him was protected speech under the First Amendment).
[¶ 14.] The Eighth Circuit has stated that the Supreme Court has not "established a bright-line test for distinguishing a true threat from protected speech." Pulaski Co. Special Sch. Dist., 263 F.3d at 836.[5] In Pulaski, the Eighth *707 Circuit analysis of the true threat doctrine provides for consideration of the following factors:
Whether an objectively reasonable recipient would view the message as a threat; whether the threat was communicated directly to its victim; whether the maker of the threat had made similar statements to the victim in the past; whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence; and whether the recipient of the alleged threat could reasonably conclude that it expresses "a determination or intent to hurt presently or in the future."
* * *
"Alleged threats should be considered in light of their entire factual context, including the surrounding events and the reaction of the listeners."
Id. (internal citations omitted). We adopt this analysis.
[¶ 15.] In applying this test, we first acknowledge that there are very few pages in the adjudicatory trial transcript that address these factors. Clearly, the evidence proves that the threats were not communicated directly to the intended victims, but rather to a teacher who had inquired into C.C.H.'s demeanor. There is, however, very little evidence upon which to determine whether an objectively reasonable recipient would view the message as a threat.
[¶ 16.] Few pages in the trial transcript prove how Keierleber, the listener, reacted after hearing C.C.H.'s words. When asked what her reaction was when C.C.H. said he wanted to kill B.C., she said, it "[k]ind of scared me. It was a very serious tone of voice. Very believable." Despite Keierleber's alleged fear, she let C.C.H. and B.C. both leave her classroom at the end of class. She did e-mail her concerns to school administrators, but there is no indication in the trial record of why the administration did not act more quickly. Additionally, the only other witness who testified about the threat was Paul Schueth, the police officer who questioned C.C.H. about the incident. He merely stated that he had a short conversation with C.C.H., during which C.C.H. denied saying that he wanted to kill B.C.
[¶ 17.] We refuse to analyze C.C.H.'s use of the word kill "in a vacuum[,]" and the surrounding untimely attentiveness by school administrators, lack of compelling testimony by Keierleber and lack of evidence regarding C.C.H.'s propensity to carry through with his threats leave us unconvinced that C.C.H. should have been adjudicated a delinquent for the words he spoke. See S.J.N-K., 2002 SD 70 at ¶ 15, 647 N.W.2d at 712 (acknowledging the Court's analysis of the circumstances surrounding the use of profane language). The evidence presented fails to prove that the solicited comments of C.C.H. constitute true threats. On this record, the only result that can be reached is that the words uttered by C.C.H. were not true threats; thus, we refrain from stripping C.C.H. of his right to free speech.
[¶ 18.] Hostility and competition among our youth is natural. It happens in competitive sports; it happens in adolescent love affairs; it happens among siblings; it is an inevitable part of growing *708 up. Many of the unkind words that stem from this hostility and competition may cause others uneasiness, but most of the words are protected by the First Amendment.
[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk; and our history says that it is this sort of hazardous freedomthis kind of opennessthat is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.
Tinker v. Des Moines Indep. Cmty. Sch. Dist, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969) (holding First Amendment protects right to wear arm bands displaying disapproval of Vietnam War to school).
[¶ 19.] Therefore, we reverse the trial court's delinquency adjudication.
[¶ 20.] GILBERTSON, Chief Justice, and KONENKAMP, Justice and GORS, Acting Justice, concur as to Issue 1.
[¶ 21.] SABERS, Justice, dissents as to Issue 1.
[¶ 22.] ZINTER, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.
SABERS, Justice (dissenting).
[¶ 24.] I vote to affirm Issue 1 because there was sufficient evidence to adjudicate C.C.H. a delinquent under SDCL 22-13-1 because he "intentionally cause[d] serious public inconvenience, annoyance, or alarm to [another] person, or create[d] a risk thereof by: (1) engaging in ... threatening behavior [.]" (emphasis added).
[¶ 25.] GORS, Acting Justice, delivers the majority on Issue 2, which reverses the trial court's finding that C.C.H. is a child in need of supervision.
[¶ 26.] C.C.H. cannot be adjudicated[6] to be a Child in Need of Supervision. No ChINS petition was filed. Therefore, C.C.H. had no notice that he was being tried as a ChINS. C.C.H. could not defend against what he was not charged with, tried for, or alleged to be.
[¶ 27.] If C.C.H. were an adult, this would not be permitted. In State v. Tschetter, 337 N.W.2d 829, 830 (S.D.1983), this Court held that a trial court could not enter a judgment of guilt for an offense other than that upon which the verdict was based. Here, the trial court entered an adjudication for another offense (ChINS status) that it thought also fit the facts. Although this Court upheld a ChINS adjudication when the evidence was insufficient to sustain a delinquency petition in In re T.K., 462 N.W.2d at 895, a trial court does not have the authority to fit a child's conduct into an uncharged category, and then adjudicate and punish the child. It is a fundamental tenet of due process that when a person is charged with something, that person is entitled to notice of what the charge is and a hearing on the charge. *709 City of Pierre v. Blackwell, 2001 SD 127, ¶ 13, 635 N.W.2d 581, 585 ("Under the Fourteenth Amendment to the United States Constitution, as well as Article VI, § 2 of the South Dakota Constitution, `no person shall be deprived of life, liberty, or property without due process of the law.' Due process guarantees that notice and the right to be heard are granted in a `meaningful time and in a meaningful manner.' Such guarantees are fundamental.") (citations omitted). The only notice C.C.H. received of the charge was when he was adjudicated to be a ChINS. He had no hearing on the ChINS allegation. The ChINS adjudication was used as a catch-all: C.C.H. must have done something wrong, so this must be it.
[¶ 28.] If the record is too limited to determine whether C.C.H.'s comments to the teacher were a "true threat" to support an adjudication for disorderly conduct, then the same insufficiency exists regarding the ChINS adjudication. A child in need of supervision is defined in SDCL 26-8B-2 as follows:
In this chapter and chapter 26-7A, the term, child in need of supervision, means:
(1) Any child of compulsory school age who is habitually absent from school without legal excuse;
(2) Any child who has run away from home or is otherwise beyond the control of the child's parent, guardian, or custodian;
(3) Any child whose behavior or condition endangers the child's own welfare or the welfare of others; or
(4) Any child who has violated any federal, state, or local law or regulation for which there is not a penalty of a criminal nature for an adult, except violations of § 34-46-2(2), or petty offenses.
C.C.H. is not a truant under subdivision (1) or beyond parental control under subdivision (2) or a status offender under subdivision (4). Subdivision (3) proscribing "behavior [which] endangers the child's own welfare or the welfare of others" is the only provision that fits the trial court's finding that "B.C.'s and other persons welfare was threatened." The burden of proof is the same for ChINS and delinquents-beyond a reasonable doubt. SDCL 26-7A-1(2) and 26-7A-86; In re T.K., 462 N.W.2d at 895; In re Interest of A.W., 438 N.W.2d at 558 (S.D.1989). If it has to be a "true threat" to be disorderly conduct, then it also has to be a "true threat" to endanger the welfare of other people because the same conduct and the same burden of proof is being considered for both adjudications.
[¶ 29.] One troubling aspect of this procedure is apparent. C.C.H. was held in pretrial detention for 66 days. A ChINS cannot be held in pretrial detention for more than 24 hours unless the child has violated a valid court order.[7] SDCL 26-7A-14, 26-7A-15, 26-8B-3. Similarly, a ChINS cannot be placed in post-trial detention as a disposition,[8] except under the very limited circumstances set forth in SDCL 26-8B-6(3) for violators of valid court orders, which is not applicable here.
[¶ 30.] Examining the evidence in the light most favorable to the State, the *710 most that can be said of C.C.H. is that when his teacher asked him what was wrong, he told her. He made no threats and created no disturbance. He took no steps to carry out his statement. It is not a ChINS offense to have bad thoughts. It is also not a ChINS offense to articulate bad thoughts, unless they are a "true threat."
[¶ 31.] Therefore, we reverse the trial court's ChINS adjudication.
[¶ 32.] SABERS and KONENKAMP, Justices, concur as to Issue 2.
[¶ 33.] GILBERTSON, Chief Justice and AMUNDSON, Justice, dissent as to Issue 2.
[¶ 34.] ZINTER, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.
AMUNDSON, Justice (dissenting).
[¶ 36.] C.C.H. argues for a reversal of the trial court's decision that he is a child in need of supervision on the same grounds that he requested reversal of the delinquency adjudication. He also mentions that no ChINS petition was submitted to the court by the State.
[¶ 37.] In In re T.K., the State's petition alleged a minor child was delinquent, but the order declared him to be a ChINS. The trial court said that it had done so because the State had not proven the underlying criminal charge of trespassing beyond a reasonable doubt. 462 N.W.2d at 894-95. We upheld the trial court's decision because "[t]he potential of violence existed. T.K.'s and other persons' welfare was threatened." Id. at 895. Similarly, we should find the trial judge did not err by finding C.C.H. a ChINS. "It is well established that the purpose of any juvenile disposition is to serve the best interest of the child and the public." Id. Here, we should find the trial court's assessment of C.C.H. as a ChINS accurate and in C.C.H.'s best interest.
[¶ 38.] I would affirm the trial court's decision on the ChINS adjudication.
[¶ 39.] GILBERTSON, Chief Justice, joins this dissent.
NOTES
[1] Under SDCL 22-13-1, disorderly conduct occurs when "[a]ny person who intentionally causes serious public inconvenience, annoyance, or alarm to any other person, or creates a risk thereof by: (1) Engaging in fighting or in violent or threatening behavior; ..."
[2] SDCL 26-8C-2 states that a delinquent child is defined as "any child ten years of age or older who ... violates any federal, state or local law or regulation for which there is a penalty of a criminal nature for an adult...."
[3] A child in need of supervision is defined by SDCL 26-8B-2 as:

(1) Any child of compulsory school age who is habitually absent from school without legal excuse;
(2) Any child who has run away from home or is otherwise beyond the control of the child's parent, guardian, or custodian;
(3) Any child whose behavior or condition endangers the child's own welfare or the welfare of others; or
(4) Any child who has violated any federal, state, or local law or regulation for which there is not a penalty of a criminal nature for an adult, except violations of § 34-46-2(2), or petty offenses.
[4] C.C.H. contends that there was insufficient evidence to adjudicate him delinquent because he did not "intentionally" threaten B.C., and therefore the state failed to prove that element of the crime underlying his delinquency adjudication. SDCL 22-13-1. C.C.H. also contends Keierleber's response to the threats was insufficient to prove the threats were a serious, public inconvenience. See SDCL 22-13-1(1) (requiring "serious public alarm" to prove disorderly conduct); State v. Rocky Mountain, 449 N.W.2d 257, 258 (S.D.1989) (explaining the "public" element of disorderly conduct).

"Intent" under the disorderly conduct statute may be proven through circumstantial evidence and a defendant's state of mind is "fairly deducible from the circumstances surrounding the offense." State v. Holzer, 2000 SD 75, ¶ 14, 611 N.W.2d 647, 651. We have further said that "[b]ecause the nature of intent is such that it is `rarely susceptible to direct proof, the fact finder may determine intent by such reasonable inferences and deductions as may be drawn from facts proved by evidence in accordance with common experience and observation.'" Id. at ¶ 16 (citation omitted). In this case, we find intent could certainly have been deduced from the evidence.
Also, the actions took place in a public school, which is clearly a public place. We have stated that "disorderly conduct may be directed at one person," and that "it is clear from the statute that an essential element of disorderly conduct is the public nature of the offense." Rocky Mountain, 449 N.W.2d at 258 (quoting Ellis v. Archer, 38 S.D. 285, 161 N.W. 192 (1917)). Thus, we need not address this issue further.
[5] Jones v. State, 347 Ark. 409, 64 S.W.3d 728 (2002), analyzed the various tests used by courts to assess whether a threat is true, and thus unprotected by the constitution. The First Circuit says the standard is "whether [the defendant] should have reasonably foreseen that the statement he uttered would be taken as a threat by those to whom it was made." Id. at 735 (citation omitted). The Second Circuit asks if the language "on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate, and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." Id. at 734-35 (citation omitted.) The Sixth Circuit asks if a reasonable person would perceive "a serious expression of an intention to inflict bodily harm" and "the purpose of furthering some goal through the use of intimidation." Id. at 735 (citation omitted). The Ninth Circuit asks, "[w]hether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." Id. (citation omitted).
[6] "Adjudication" in juvenile court is the functional equivalent of the "guilt or innocence" phase in adult court. SDCL 26-7A-1(2).
[7] The exception to the 24 hour limit to pretrial detention of a ChINS, for a child who has violated a valid court order, is not at issue here. SDCL 26-8B-3.
[8] "Disposition" in juvenile court is the functional equivalent of sentencing in adult court. SDCL 26-7A-1(17), 26-8B-6 and 26-8C-7. If C.C.H. had been tried as an adult, the maximum sentence would have been thirty days in jail and a $200 fine. SDCL 22-13-1 and 22-6-2(2).