Youngdahl *v.* Rainfair, Inc.

5-884                                      288 S. W. 2d 589

Opinion delivered March 19, 1956.

[Rehearing denied April 23, 1956.]

*McMath, Leatherman & Woods* and *William J. Isaacson,* for appellant.

*Shaver & Shaver,* for appellee.

Minor W. Millwee, Associate Justice. Appellee, Rainfair, Inc., is engaged in the manufacture of men's slacks in its plant at Wynne, Arkansas, where it employed approximately one hundred women and seven men in April, 1955. None of the employees were members of a labor union at that time but some of them had signed membership application cards with appellant, Amalgamated Clothing Workers of America, C. I. O., hereinafter called "Union." On Monday, May 2, 1955, twenty-nine employees failed to return to work and a picket line was established by the Union. Appellee's plant manager notified said employees by registered mail that it would be assumed that they were quitting their jobs if they did not return to work in three or four days. Three employees returned to work but twenty-six remained on strike and the picketing was continued un-

til May 19, 1955, when the pickets were withdrawn and the strikers applied for reinstatement. In the meantime appellee had hired thirteen new employees and immediate reinstatement of the strikers was declined.

On June 17, 1955, the strikers met with several staff members of the Union at Forrest City, Arkansas, and voted to re-establish the picket line. In the meantime the Union filed alleged unfair labor practice charges against appellee before the National Labor Relations Board which were still pending at the time of the hearing in the instant case. The picket line was re-established about 6:00 a. m. on Monday, June 20, 1955, and on June 24 appellee filed the instant suit against the Union and certain staff members and strikers, as a class, to enjoin them from picketing and the commission of certain acts of intimidation, violence, threats, abuse, insults and breaches of the peace allegedly committed by appellants along the picket line and upon Union premises directly across the street from appellee's plant.

On June 30 appellants filed a motion to vacate a temporary injunction issued on the date suit was filed. At the hearing held on said motion on July 1, it was agreed that the testimony there adduced would be considered on appellee's application for a permanent injunction. A citation for contempt against certain persons for violation of the temporary injunction was dismissed after a hearing on July 27. The chancellor took the case under advisement and this appeal is from a decree entered September 15, 1955, making the temporary injunction permanent.

Appellants contend the decree violates their rights of free speech and assembly under the U. S. and Arkansas Constitutions; that there was no showing that the picketing resulted in violence, breaches of the peace or other unlawful acts; that the language used by the strikers along the picket line is common in all labor disputes; and that the regulation of the subject matter of the suit is exclusively reserved to the National Labor Relations Board. In the light of these and other con-

tentions we proceed to an examination of the evidence which is for the most part undisputed.

While the pleadings and testimony were directed primarily to incidents which occurred during the second picketing, there was evidence that some of them were merely a resumption of the pattern set in the first picketing. The plant manager was followed by the strikers every time he left the plant in his car. One of the pickets told him she was going to wipe the sidewalks clean with him and send him back to Wisconsin. He had so many anonymous telephone calls at his home after 9:00 p. m. that he had to have the phone disconnected. Nails and roofing tacks were strewn over the parking area of appellee's plant and the driveways at the homes of the plant manager and twelve of the women employees.

When the picketing was resumed on June 20, 1955, the Union rented a vacant lot directly across Rowena Street from the main entrance to appellee's plant. The street runs north and south and is about twenty feet wide. Appellants placed a tent on the lot in which they installed a telephone, tables, benches and chairs and the lot was used as headquarters for the strikers. One of appellee's employees, Mrs. Jewell Newby, lived in a trailer next to the Union lot and within a few feet of their tent. About 12:30 a. m. on June 20, she observed two women strikers driving up and down Rowena Street who had previously threatened to move her trailer and whip her. The strikers then parked their truck near the trailer and punctured two tires on an automobile belonging to Mrs. Newby's daughter who was visiting her at the time. The two strikers were arrested and convicted on criminal charges preferred by Mrs. Newby. About five o'clock on the same morning a window of appellee's plant was found to have been broken and a black snake about five feet long was found coiled inside the plant under the broken window.

The picketing was resumed about 6:00 a. m. on June 20 with usually one or two carrying signs up and down Rowena Street in front of the plant. Other Union staff

members, strikers and their sympathizers would assemble under and around the tent in groups estimated at different times from eight to thirty-seven. As the employees would go to and from work at the plant, or go to lunch, or take a recess, the strikers would congregate along the west edge of their lot and sometimes in Rowena Street and engage in loud and offensive name calling, singing or shouting directed at the workers. They would call the workers "scabs," "dirty scabs," "fat scabs," "yellow scabs," "crazy scabs," "cotton patch scabs," "pony tailed scabs," "fuzzy headed scabs," "fools," "cotton picking fools," and other similar names. This took place every time an employee left or entered the plant. It was done by the strikers individually, in couples or by the entire group and in a loud and boisterous manner. One witness described it as "just bedlam" when more than a dozen joined in the shouting. Particular names or remarks were reserved for individual workers. One pregnant worker was greeted with, "Get the hot water ready," or, "I am coming to make another payment on the baby, call Dr. Beaton," or, "Why, you can work another hour until you go to the delivery room." This worker and another drove to a filling station for gasoline when two of the strikers drove up and told the attendant not to wait on "these scabs" before he waited on the strikers.

One worker said the strikers always called her "fat scab," and that individual pickets and strikers made fun of her clothing and asked her if "Pete," the plant manager, still liked her "low-cut dresses and earrings." This made the employee so angry she invited the picket to come over and "make it some of her business." This worker thought she had a right to work without being molested and insulted because she had two boys to support. On one occasion two strikers drove by a house where two workers were visiting and one of the strikers shouted, "You gals better check your sheets tonight. There might be a snake in them."

The strikers sang songs with improvised lyrics to the tune of certain popular ballads and religious and Union songs. "When the Saints Go Marching In" be-

came "When the Scabs Go Marching In" and the ballad, "Davy Crockett," began, "Born in a cotton patch in Arkansas, the greenest gals we ever saw . . ."

The women pickets would stand in the street or sit near the plant and shout ugly names, stick out their tongues, hold their noses and make a variety of indecent gestures while pointing at the workers in the plant. Several workers testified the continuous name calling and boisterous conduct of the strikers made them afraid, angry, ill or nervous and had an adverse effect on their ability to properly do their work. Some of the workers would talk back to the strikers while others remained silent. The Chief of Police of Wynne testified there was more tension during the second picketing than the first and that he was fearful there was going to be trouble during the second picketing and so informed Union staff members. One staff member called him once when trouble seemed imminent and wanted to "go on record" as having requested the presence of the officer.

The Assistant Regional Director of the Union testified that the purpose of the second picketing was to exert "moral pressure" on the workers and because of certain unfair labor practices of appellee. While the Union had an action pending before the National Labor Relations Board on account of such alleged practices, he expressed an unwillingness to await the Board's action before proceeding with the trial of the instant suit. The principal complaint was asserted to be appellee's refusal to recognize Union's offer of proof of majority status, but it was admitted that Union was unwilling to go into an election and had withdrawn its request therefor at the time of the hearing. The assistant director and other staff members considered it insulting to be called a "scab" but they felt that others might look upon it as a "badge of honor."

In support of their numerous contentions that the decree appealed from is in violation of their constitutional rights, and that the picketing involved here was legal and peaceable, appellants rely upon such cases

as *Thornhill* v. *Alabama*, 310 U. S. 88, 60 S. Ct. 736, 84 L. Ed. 1093; *Carlson* v. *California*, 310 U. S. 106, 60 S. Ct. 746, 84 L. Ed. 1104; *Cafeteria Employees* v. *Angelos*, 320 U. S. 293, 64 S. Ct. 126, 88 L. Ed. 58; *Bakery & Pastry Drivers* v. *Wohl*, 315 U. S. 769, 62 S. Ct. 816, 86 L. Ed. 1178; *Local No. 802* v. *Asimos*, 216 Ark. 694, 227 S. W. 2d 154; and *Boyd* v. *Dodge*, 217 Ark. 919, 234 S. W. 2d 204. In urging the opposite view, appellee cites and relies upon *Milk Wagon Drivers Union* v. *Meadowmoor Dairies*, 312 U. S. 287, 61 S. Ct. 552, 85 L. Ed. 836, 132 A. L. R. 1200; *Allen-Bradley Local* v. *Wisconsin Employment Relations Board*, 315 U. S. 740, 62 S. Ct. 820, 86 L. Ed. 1154; *Hughes* v. *Superior Court of California*, 339 U. S. 460, 70 S. Ct. 718, 94 L. Ed. 985; *Local Union No. 313* v. *Stathakis*, 135 Ark. 86, 205 S. W. 450; *Riggs* v. *Tucker Duck & Rubber Company*, 196 Ark. 571, 119 S. W. 2d 507; and *Smith* v. *F & C Engineering Company*, 225 Ark. 688, 285 S. W. 2d 100. It would serve no useful purpose to differentiate the factual situation presented in the instant case from any of the cases cited above. The whole issue here would seem to boil down to whether the appellants were engaged in peaceful picketing. If so, the court wrongfully issued the injunction. If not, the decree should be affirmed. All the cases seem to agree that workers have the constitutional right to engage in peaceful picketing, unattended with violent conduct, but that picketing carried on with intimidation, threats, violence, coercion or other unlawful means is illegal and may be enjoined.

A constitutional right to abuse, insult, slander or intimidate others is simply nonexistent in this country. Freedom of speech does not mean freedom of vituperation nor does it mean freedom of a person to insult, revile or intimidate others. As the court said in *Chaplinsky* v. *State of New Hampshire*, 315 U. S. 568, 62 S. Ct. 766, 86 L. Ed. 1031: "Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of

which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words — those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' *Cantwell* v. *Connecticut,* 310 U. S. 296, 309, 310, 60 S. Ct. 900, 906, 84 L. Ed. 1213, 128 A. L. R. 1352." It has long been a violation of the criminal laws of this state for any person to ". . . make use of any profane, violent, vulgar, abusive or insulting language toward or about any other person in his presence or hearing, which language in its common acceptation is calculated to arouse to anger the person about or to whom it is spoken or addressed, or to cause a breach of the peace or an assault . . ." Ark. Stats. Sec. 41-1412.

The words of Judge Eder in *Lilly Dache, Inc.* v. *Rose,* 28 N. Y. S. 2d 303 are peculiarly applicable here: "There is nothing mysterious in the term 'peaceable picketing.' To picket is to post a watcher to observe; as applied to a labor dispute it means the stationing of one or more persons to observe and to attempt to persuade; peaceable picketing means simply, tranquil conduct, conduct devoid of noise or tumult, the absence of a quarrelsome demeanor, a course of conduct that does not violate or disturb the public peace; this is but a common-sense definition. As a necessary corollary, boisterous conduct, the use of vile language, bellicose demeanor, threats, violence, coercion, intimidation, shouting, and interference with the use of the premises or impeding the public highway, as by mass picketing, which is the use of a large number of pickets, is not peaceable picketing, but is illegal picketing."

It is true that an injunction prohibiting all picketing may not be based upon isolated and episodic acts of violence or other unlawful conduct. Even if it be conceded that the acts of violence involved here fall in that category, there was nothing isolated nor infrequent about the persistent abuse, insults and epithets along the picket line. Many jurisdictions have authorized such injunctions where the strikers' acts and conduct have been so entangled with violence and other illegal conduct that future excesses might reasonably be anticipated in the light of what was previously done. See cases collected in 132 A. L. R. 1218. According to the undisputed evidence here, the whole pattern of conduct along the picket line discloses a clear design on the part of the appellants to intimidate and coerce their former fellow workers by persistent abuse, insults and conduct calculated to cause breaches of the peace and other unlawful results. It is difficult to understand how any court could classify such conduct as ''peaceful picketing.''

While the question of jurisdiction was not raised below and appellants expressed an unwillingness to await the action of the National Labor Relations Board on their charges of unfair labor practices against appellee before proceeding with the trial of the instant case, it is now earnestly contended that the chancery court lacked jurisdiction which is exclusively reserved to the N. L. R. B. under federal statutes. Appellants rely on *Garner* v. *Teamsters Local* 776, 346 U. S. 485, 74 S. Ct. 161, 98 L. Ed. 228, and *Weber* v. *Anheuser-Busch,* 348 U. S. 468, 75 S. Ct. 480, 99 L. Ed. 546. The facts in these cases bear little similarity to those involved here, and we find nothing to indicate an intention to supplant or overrule the doctrine of *Allen-Bradley Local* v. *Wisconsin Employment Relations Board, supra,* where it was held that the state may still exercise its historic powers over such traditionally local matters as public safety and order and the use of streets and highways. In the *Garner* case the court was careful to point out that the activity there enjoined did not threaten a probable breach of the state's peace. In *International Union U. A. W.* v. *Wisconsin Employment Relations*

*Board,* 336 U. S. 245, 69 S. Ct. 516, 93 L. Ed. 651, the court said: ''While the Federal Board is empowered to forbid a strike, when and because its purpose is one that the Federal Act made illegal, it has been given no power to forbid one because its method is illegal — even if the illegality were to consist of actual or threatened violence to persons or destruction of property. Policing of such conduct is left wholly to the states.'' See also, *Amalgamated Clothing Workers of America, et al.* v. *The Rickman Brothers,* 348 U. S. 511, 75 S. Ct. 452, 99 L. Ed. 600; *National Labor Relations Board* v. *Longview Furniture Company,* 4 Cir., 206 Fed. 2d 274.

We realize that the U. S. Supreme Court is the final arbiter as to the extent the different federal acts have affected the traditional state jurisdiction to enjoin picketing by unlawful means or for illegal purposes. So far the state courts have been unanimous in holding that the National Labor Relations Act does not preclude them from granting injunctive relief against picketing in a manner that is unlawful under state law. See cases collected in 36 A. L. R. 2d 1037. Until otherwise told, we shall assume that it was not the purpose of the federal act to deprive a state court of its ancient jurisdiction in such matters.

The decree is affirmed.