Blake JONES *v.* STATE of Arkansas

01-695 64 S.W.3d 728

Supreme Court of Arkansas
Opinion delivered January 17, 2002

*H. Brock Showalter*, Deputy Public Defender, for appellant.

*Mark Pryor*, Att'y Gen., by: *Vada Berger*, Ass't Att'y Gen., for appellee.

R OBERT L. BROWN, Justice. This is an appeal by appellant Blake Jones from an adjudication of delinquency based on the offense of terroristic threatening in the first degree, a Class D felony. He was sentenced to twenty-four months of supervised

probation and seven days to serve in the Juvenile Detention Center. Jones raises two points on appeal: (1) the juvenile judge erred in denying his motion for directed verdict because the State had not proven the requisite mental intent for terroristic threatening; and (2) the rap song involved is protected speech under both the Arkansas and United States Constitutions. We affirm the adjudication and the disposition.

Blake Jones was fifteen at the time of the events giving rise to this appeal. While attending Fayetteville High School, a fellow student named Allison Arnold, who was also fifteen, had befriended him. The two had been friends for about three years. At various times while Jones was away at juvenile detention facilities for various offenses, Arnold wrote letters to him. On occasion, Jones composed rap songs and gave them to Arnold to read. In her trial testimony, Arnold said that he wrote poems and notes and gave them to her, and that "He'd always say he was expressing himself through a poem." She said some of those rap songs or poems contained violent language, but they were not directed toward any particular person. She described her relationship with Jones as a friendship in which she "just tried to witness to him." She had taken him to church with her family and had spoken to him about religious matters. Arnold added that she had wanted to help Jones and "give him hope."

On February 15, 2001, during the second period of the school day, Jones wrote several notes to Arnold in class and gave them to her. She refused to write back and let him know that she was not going to write notes because she wanted to pay attention in class. Her refusal to respond made Jones mad. He testified that upon his recent return to Fayetteville High School from the detention facility, their friendship had cooled, and Arnold had acted "snobby" toward him. After she refused to write back to him, he wrote a rap song and gave it to her:

> I hope you remember this day, cuz you'll forever be the cause of my violence and rage,
>
> You steadily rejected me, now I'm angry and full of fucking misery,
>
> You try to be judgmental telling me to act right. Before you take the speck from my eye, take the fucking board from your eye,

I didn't do nothing to deserve this, and now I'm stressed, and when I'm stressed, I'm at my best,

I'm a motherfuckin murderer, I slit my mom's throat and killed my sister. You gonna keep being a bitch, and I'm gonna cliche [click],

My hatred and aggression will go towards you, you better run bitch, cuz I can't control what I do. I'll murder you before you can think twice, cut you up and use you for decoration to look nice,

I've had it up to here bitch, there's gonna be a 187 on your whole family trik [trick],

Then you'll be just like me, with no home, no friends, no money,

You'll be deprived of life itself, you won't be able to live with yourself,

Then you'll be six feet under, beside your sister, father, and mother,

You'll be in hell, and I'll be in Jail, but I won't give a fuck cuz we all know I've been there before,

Goodbye forever my good friend. I'll see you on judgement day when I'm punished for my sin.[1]

Jones did not give Arnold the rap song immediately, but he handed it to her during fifth period. While Arnold read the song, Jones was laughing. He asked Arnold whether she liked the rap lyrics, and she told him that she thought they were "sick and gross." She further testified that she was frightened and appalled because: "[H]e knew where I lived, he knew my family, he wrote about my sister[ ] and my dad, that's written to my family. It was handed to me, and it was given to me. It was written for me." Jones asked her to give the note with the rap lyrics back to him, and she refused.

There are two matters of factual dispute surrounding this incident. First, although Jones claimed he told her "Don't take this serious," Arnold denied that he made the statement. The second factual dispute is whether or not Arnold first asked to see his

---

[1] Although the content of the rap indicates otherwise, Jones's mother was not dead. In fact, Jones previously had told Arnold that his mother was killed in a car accident, though this was untrue as well.

writing. In Jones's written statement, he asserted that Arnold asked to see the note. Arnold denied this in her trial testimony.

Instead of handing the note back to Jones, Arnold asked the teacher if she could use the restroom. She testified that this interchange with her teacher occurred within three to five minutes after she read the note. A witness for Jones, Sarah Stone, testified that the time differential was more like fifteen minutes. After getting permission to leave the classroom, she went directly to principal John Wesson's office. Once in the principal's office, she showed him the note. He called the Fayetteville Police Department and then called Jones to the office.

Officer David Williams arrived, and Arnold told him that she felt scared because she thought Jones was capable of carrying out the conduct described in the note. According to Officer Williams's trial testimony, Arnold was crying and seemed scared of Jones, positioning herself so that the police officer physically separated the two of them. Jones, on the other hand, told the police officer that he did not believe that "this was a big deal, and he didn't understand why everyone was upset." He volunteered an apology to Arnold. He also gave a statement admitting that he wrote the note. According to Principal Wesson's testimony, he told the principal and Officer Williams that he was "modeling his writing after [rap artist] Eminem." He insisted that he was simply writing "to get his feelings out." In his written statement he said: "I got mad and wrote a letter to express myself. It was a rap and pretty gruesome." Principal Wesson testified that Jones seemed to have no understanding that his writing could frighten or harm another person.

On February 16, 2001, the prosecuting attorney filed a Petition for Adjudication of Delinquency against Jones. The petition alleged that Jones had committed an act of terroristic threatening in violation of Ark. Code Ann. § 5-13-301 (Repl. 1997), a Class D felony.[2] On February 27, 2001, the petition was heard in juvenile court. The prosecutor presented the testimony of Arnold, Officer Williams, Principal Wesson, and Allison Arnold's father, J.R. Arnold. At the conclusion of the State's case, the defense moved for a directed verdict on the specific ground that the State had failed to prove the requisite intent to terrorize or cause extreme fright. The

---

[2] The petition also alleged that Jones had engaged in disorderly conduct in violation of Ark. Code Ann. § 5-71-207 (Repl. 1997), a Class C misdemeanor. Apparently, in the van on the way back to Youth Bridge, the juvenile facility where Jones lived, he exposed himself. This incident is not at issue in this appeal.

juvenile judge denied the motion. Defense counsel then presented the testimony of Fayetteville High School student Sarah Stone, who testified about Jones's history of writing rap songs, and next the testimony of Jones himself. After Jones's testimony was concluded, the following exchange occurred:

> THE COURT: Thank you, Mr. Jones. You can return to your seat. Call your next, Ms. Poole.
>
> DEFENSE COUNSEL: The defense rests, Your Honor.
>
> THE COURT: Thank you. Statements, Ms. Robinson?

The defense did not renew its motion for directed verdict. The State then immediately began its closing argument.

After closing arguments, the juvenile judge ruled from the bench. She found that the rap lyrics constituted a threat. She noted that Jones was mad at Arnold when he wrote the rap song and that the lyrics were intended to cause Arnold fear. The judge further observed that Arnold knew of Jones's criminal history, and that Arnold had been intensely frightened and upset by the episode. She adjudicated Jones delinquent on the charge of terroristic threatening and sentenced him to 24 months of supervised probation, as well as seven days in a juvenile detention facility. She specifically ordered that Jones have no contact with Arnold or her family. Because Jones was already in state custody at the time of the incident and resultant trial, the judge committed Jones to the custody of the Department of Youth Services.

## I. Sufficiency of the Evidence

Jones's first point on appeal is that the trial judge erred in denying his motion for a directed verdict based on the fact that the State failed to prove the required mental state for terroristic threatening.[3] We are precluded from addressing this point because it is not preserved for our review.

 Under the Juvenile Code, the Arkansas Rules of Criminal Procedure apply to delinquency proceedings. Ark. Code Ann.

---

[3] For purposes of a bench trial, Ark. R. Crim. P. 33.1(b) uses the term "motion for dismissal" rather than "motion for directed verdict."

§ 9-27-325(f) (Supp. 2001); *see also* L.H. *v. State*, 333 Ark. 613, 973 S.W.2d 477 (1998); *Mason v. State*, 323 Ark. 361, 914 S.W.2d 751 (1996). Arkansas Rule of Criminal Procedure 33.1 states in relevant part:

> (b) In a nonjury trial, if a motion for dismissal is to be made, it shall be made at the close of all of the evidence. The motion for dismissal shall state the specific grounds therefor. If the defendant moved for dismissal at the conclusion of the prosecution's evidence, then the motion must be renewed at the close of all of the evidence.

> (c) The failure of a defendant to challenge the sufficiency of the evidence at the times and in the manner required in subsections (a) and (b) above will constitute a waiver of any question pertaining to the sufficiency of the evidence to support the verdict or judgment.

Ark. R. Crim. P. 33.1 (b)-(c). Thus, if a defendant fails to renew a motion for dismissal at the close of all the evidence, the sufficiency challenge is deemed waived on appeal. *See also Trammell v. State*, 70 Ark. App. 210, 16 S.W.3d 564 (2000) (juvenile adjudicated delinquent on terroristic threatening charge waived his sufficiency challenge on appeal when he did not renew his motion for directed verdict after the close of all the evidence).

Here, Jones in no way attempted to renew his motion at the close of all the evidence. After Jones rested his case, the State immediately began closing arguments. Accordingly, Jones waived any sufficiency arguments that he may have presented to the juvenile judge by way of his initial motion to dismiss at the close of the State's case.

## II. Free Speech Argument

We turn next to Jones's contention that his rap song was protected speech under the Arkansas and U.S. Constitutions. As an initial point, we fail to see where Jones's counsel raised the Arkansas Constitution as an argument before the juvenile judge. Arguments, even constitutional arguments, are improperly raised for the first time on appeal. *B.C. v. State*, 344 Ark. 385, 40 S.W.3d 315 (2001) (holding, in juvenile delinquency adjudication, that juvenile's equal protection argument was not preserved when it was not raised before the trial court); *see also Goff v. State*, 341 Ark. 567, 19 S.W.3d 579 (2000); *McGhee v. State*, 330 Ark. 38, 954 S.W.2d 206 (1997).

Because it is not preserved, we will not address his claim under the Arkansas Constitution.

Whether Jones's rap song was protected speech under the U.S. Constitution was argued to the juvenile judge by both the prosecutor and defense counsel in closing arguments. The prosecutor contended that the rap song fell within an exception to protected speech because it was a threat. Defense counsel responded that Jones did not lose his First Amendment protection while in school and referred to a Pulaski County School District case where a rap song was found to be protected speech.[4] The prosecutor responded that Jones's rap song fell within the fighting-words exception to protected speech and that the Pulaski County School District case was distinguishable. The juvenile judge agreed and found that the rap song was not protected speech but fell within the fighting-words exception to First Amendment protection. Because the First Amendment and its exceptions were specifically argued to the juvenile judge, and her findings were based in part on constitutional principles, we deem the argument to be appropriately before us.

■ Turning to his free-speech claim under the U.S. Constitution, Jones urges that neither the "fighting words" nor the "true threat" exception apply to his case and that his rap song was protected speech. We disagree. Preliminarily, we note that Jones is not mounting a facial challenge to our terroristic threatening statute (Ark. Code Ann. § 5-13-301(a)(1)(A) (Repl. 1997)), as was the case with the statute at issue and the vagueness assertion in *Shoemaker v. State*, 343 Ark. 727, 38 S.W.3d 350 (2001), which Jones relies on. Rather, Jones contends that the application of the statute to his rap song is unconstitutional under the First Amendment. The First Amendment is made applicable to the states through the Fourteenth Amendment. *Lovell v. City of Griffin*, 303 U.S. 444 (1938). The United States Supreme Court in *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), noted that its jurisprudence, over the years, has recognized several exceptions to blanket protection for expressive speech. *R.A.V.*, 505 U.S. at 382-83 ("From 1791 to the present, however, our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas, which are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the

[4] The reference was to *Doe v. Pulaski County Special Sch. Dist.*, 263 F.3d 833 (8th Cir. 2001) (rehearing *en banc* granted and opinion vacated, Nov. 5, 2001).

social interest in order and morality.' ") (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942)).

Two of those categories of unprotected speech are at issue in this case. The first is the well-established "fighting words" doctrine. *See Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942); *Shoemaker v. State, supra*; *Johnson v. State*, 343 Ark. 343, 37 S.W.3d 191 (2001). The second is the "true threat" exception. *See Watts v. United States*, 394 U.S. 705 (1969) ("'What is a threat must be distinguished from what is constitutionally protected speech."); *Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 371 (9th Cir. 1996) ("In general, threats are not protected by the First Amendment.").

■ "Fighting words" have been defined by the United States Supreme Court as "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. New Hampshire, supra*. Quoting the New Hampshire Supreme Court, the *Chaplinsky* Court alternatively described fighting words as those which "have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed." *Id.* at 573. This court first recognized the "fighting words" doctrine in 1956 in the case of *Youngdahl v. Rainfair, Inc.*, 226 Ark. 80, 288 S.W.2d 589 (1956) (quoting extensively from *Chaplinsky* and upholding, over striking workers' constitutional objection, an injunction against picketing). We have since applied it a number of times in different contexts. *See, e.g., Johnson v. State, supra* (assessing as-applied challenges to statute); *Lucas v. State*, 257 Ark. 726, 520 S.W.2d 224 (1975) (giving statute a narrowed reading); *Shoemaker v. State, supra* (declaring statute unconstitutional). We agree with the State that the fighting-words exception is not applicable to the facts of this case.

The "true threat" doctrine was first announced in the United States Supreme Court case of *Watts v. United States, supra*. In *Watts*, the Court held that the defendant could not be prosecuted for a statement made at a political rally which, when taken literally, threatened President Lyndon Johnson's life. Instead, the Court directed that "[w]hat is a threat must be distinguished from what is constitutionally protected speech." *Watts*, 394 U.S. at 707. However, the Court also held that the statute which makes a knowing threat against the president a crime was constitutional. The Court did not set out a test in *Watts* for distinguishing between a true threat and hyperbolic political comment.

Since *Watts*, several federal circuit courts have disagreed on the applicable standards governing the assessment of whether a threat is true and, thus, not protected by the First Amendment. The question has been addressed by the First, Second, Sixth, Eighth, Ninth, and Tenth Circuit Courts of Appeal and by various state supreme courts as well. The Circuit Courts disagree, however, on whether the appropriate focus should be on the declarant of the statement and what he should reasonably have foreseen, or rather on the recipient of the statement and what she reasonably would have believed.

For example, the First Circuit has held that the appropriate standard is "whether [the defendant] should have reasonably foreseen that the statement he uttered would be taken as a threat by those to whom it is made." *U.S. v. Fulmer*, 108 F.3d 1496, 1491 (1st Cir. 1997). However, the Second Circuit has announced its test that a true threat exists when the language "on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate, and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *United States v. Francis*, 164 F.3d 120, 122-23 (2d Cir. 1999) (citing *United States v. Kelner*, 534 F.2d 1020 (2d Cir. 1976)). The Second Circuit has further said: "The test is an objective one — namely, whether 'an ordinary, reasonable recipient who is familiar with the context of the letter would interpret it as a threat of injury.' " *United States v. Malik*, 16 F.3d 45 (2d Cir. 1994) (internal citation omitted).

The Sixth Circuit, on the other hand, has said: "Although it may offend our sensibilities, a communication objectively indicating a serious expression of an intention to inflict bodily harm cannot constitute a threat unless the communication also is conveyed for the purpose of furthering some goal through the use of intimidation." *United States v. Alkhabaz*, 104 F.3d 1492, 1495 (6th Cir. 1997). *See also United States v. DeAndino*, 958 F.2d 146, 148 (6th Cir. 1992) ("[T]he standard . . . is an objective standard, *i.e.*, would a reasonable person consider the statement to be a threat."). The Ninth Circuit has set a slightly different objective test: "[W]hether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *Bauer v. Sampson*, 261 F.3d 775, 782 (9th Cir. 2001) (quoting *Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 371 (9th Cir. 1996)).

The Eighth Circuit has taken a somewhat different approach from those of the other circuits in establishing an objective

test. Rather than a brief verbal formulation of a test, the Eighth Circuit has outlined five factors which govern its review of whether a threat is true or hyperbolic. In *United States v. Dinwiddie*, 76 F.3d 913 (8th Cir. 1996), the Eighth Circuit said:

> When determining whether statements have constituted threats of force, we have considered a number of factors: the reaction of the recipient of the threat and of other listeners; whether the threat was conditional; whether the threat was communicated directly to its victim; whether the maker of the threat had made similar statements to the victim in the past; and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence. This list is not exhaustive, and the presence or absence of any one of its elements need not be dispositive.

*Dinwiddie*, 76 F.3d at 925.

The five *Dinwiddie* factors were recently applied in the Pulaski County Special School District expulsion case, which was argued before the juvenile judge and where a rap song was also at issue. In *Doe v. Pulaski County Special Sch. Dist.*, 263 F.3d 833 (8th Cir. 2001) (panel decision vacated and *en banc* rehearing granted Nov. 5, 2001), a panel of the Eighth Circuit ruled the defendant school district's expulsion of a student for writing a threatening rap song to his ex-girlfriend unconstitutional. That panel's decision was subsequently vacated on November 5, 2001, and rehearing *en banc* was granted by the Eighth Circuit. At this writing, the rehearing *en banc* has not taken place.

In *Doe*, the expelled student wrote his rap song during the summer months when school was not in session. He wrote the four-page song to his ex-girlfriend, K.G., with whom he was extremely angry because she had broken up with him in order to be with another boy. In the song/letter, Doe threatened to rape K.G., sodomize her, and kill her with a knife by hiding under her bed. A friend of Doe's found the rap lyrics in Doe's bedroom. Doe eventually told K.G. in a telephone conversation about the general content of the letter. During this conversation, she asked to see the letter, and he refused. Through the same friend who initially found the letter, she was later able to covertly obtain it. K.G. was frightened and worried about the contents of the letter, and one of her friends reported her concerns to school administrators. After this report, the letter came to light, and Doe was expelled by the school after an administrative process. No criminal charges were brought.

Doe filed suit in federal district court to set aside the expulsion, and the district judge ruled the expulsion a violation of the First Amendment. In an unpublished disposition, the district court held that the letter did not constitute a true threat to K.G. The now-vacated Eighth Circuit panel affirmed that decision. That panel, in applying the *Dinwiddie* factors, particularly emphasized three factors. First, the panel found it significant that Doe did not show the letter to K.G. Secondly, K.G. had no knowledge of any past violent behavior on Doe's part. Finally, Doe and K.G. continued to see one another socially at church functions even after K.G. knew about the content of the letter. For these reasons, the panel affirmed the district judge's decision that the letter did not constitute a true threat to K.G.

■ Turning to the case at bar, we observe that this court has never addressed the "true threat" doctrine, and, accordingly, has never adopted a test for what constitutes a true threat. In considering the various tests adopted by the circuit courts and various state supreme courts, we conclude that an objective test focusing on how a reasonable person would have taken the statement and using the *Dinwiddie* factors has the most merit. *See also In re Kyle M.*, 200 Ariz. 447, 27 P.3d 804 (Ct. App. 2001); *State v. Perkins*, 243 Wis. 2d 141, 626 N.W.2d 762 (2001); *In re Steven S.*, 25 Cal. App. 4th 598, 31 Cal. Rptr. 2d 644 (1994). As reported in *Dinwiddie*, those factors are not exclusive but provide initial guidance in groping with the question.

■ Applying the five *Dinwiddie* factors to this case, we conclude that Jones's language constituted a true threat to Arnold. First, there was the reaction of Arnold to the threat. Her reaction to Jones's letter was immediate and unequivocal. Within minutes of receiving it, she asked permission to leave the classroom. She then proceeded to the principal's office where she reported the incident. She was intensely frightened and upset, by everyone's account, and she told the attending police officer that she believed Jones was capable of carrying out the threat because he had a criminal record and knew where her family lived.

■ Secondly, the threat made was not conditional. The lyrics which Jones composed indicated that he was mad at Arnold, and he placed no conditions on his intended conduct. Thirdly, Jones communicated the threat directly to Arnold by handing the note to her. Finally, though Jones had not made similar statements to Arnold in the past, she clearly believed that he had the capacity to carry out his threat. She knew that he had been in and out of juvenile

detention facilities for various offenses. And while Jones's offenses may have been nonviolent — the record on appeal does not reveal his criminal history — Arnold was convinced that his juvenile record indicated a criminal disposition to make good his threat. Viewing these factors together, we conclude that a reasonable person in Arnold's position would have taken the rap song as a true threat.

Moreover, there are several important factual differences between this case and *Doe v. Pulaski County Special Sch. Dist., supra.* Our review in the instant case is of a juvenile adjudication and not administrative action, as is the case in *Doe.* Also, unlike *Doe,* Jones wrote his rap lyrics and within hours gave the song directly to Arnold. Arnold also knew that Jones had a juvenile record for criminal offenses, and she immediately went to the authorities upon receiving the letter and ceased contact with Jones, unlike the *Doe* victim who continued to socialize with Doe for some time after learning about his rap song.

We affirm the juvenile judge's decision. Although the judge based her decision on the "fighting words" doctrine, we can still affirm her decision because she reached the right result, albeit for the wrong reason. *See, e.g., Harris v. State,* 339 Ark. 35, 2 S.W.3d 768 (1999) (citing *Dandridge v. State,* 292 Ark. 40, 727 S.W.2d 851 (1987); *Chisum v. State,* 273 Ark. 1, 616 S.W.2d 728 (1981)). We hold that because Jones's rap lyrics constituted a true threat to Arnold, the rap song is not protected by the First Amendment.

Affirmed.

IMBER, J., not participating.