Cite as 2025 Ark. App. 76

# ARKANSAS COURT OF APPEALS
## DIVISIONS III & IV
### No. CR-24-178

| | | |
|---|---|---|
| MINOR CHILD | | Opinion Delivered February 12, 2025 |
| | APPELLANT | |
| | | APPEAL FROM THE JEFFERSON COUNTY CIRCUIT COURT |
| V. | | [NO. 35JV-23-290] |
| | | |
| STATE OF ARKANSAS | | HONORABLE EARNEST E. BROWN, |
| | APPELLEE | JR., JUDGE |
| | | |
| | | AFFIRMED |

**ROBERT J. GLADWIN, Judge**

Appellant Minor Child ("MC") appeals from the Jefferson County Circuit Court's October 30, 2023 delinquency adjudication finding that he committed terroristic threatening in violation of Arkansas Code Annotated section 5-13-301(a)(1)(B) (Supp. 2023), a Class D felony, for which he was sentenced to thirty days' suspended imposition of sentence and placed on probation for an indeterminate period of time not to exceed two years. MC argues that the circuit court erred in adjudicating him delinquent because the State's evidence failed to satisfy the elements of the offense. We affirm.

I. *Facts and Procedural History*

MC was a student at Focus Academy in Pine Bluff. On September 15, 2023, MC was arrested by the school resource officer, Glenn Wright, following an incident on campus. A petition alleging delinquency was filed on September 18, and the delinquency adjudication

hearing was held on October 16, at which the State presented two witnesses: Officer Wright; and Eric Elders, the director of Focus Academy.

Officer Wright testified that he first encountered MC in Director Elders's office. He explained that MC had been sent to the office by one of the teachers and that he had left the office without permission. After MC had returned to the office, Officer Wright heard a loud noise and yelling in the office. He walked back toward the office and realized that MC was refusing to go to class. Officer Wright explained that Director Elders asked him to escort MC back to class, during which MC was angry and used combative language and profanity. As part of his case file, Officer Wright provided a portion of the school's security footage, which was played at the adjudication hearing:

| | |
|---|---|
| DIRECTOR ELDERS: | Officer Wright, make sure that you get that statement. Then I'll put it down that I heard the same thing. |
| [Indiscernible] | |
| DIRECTOR ELDERS: | He said the school needs to blow up. |
| MC: | I did not say that. |
| . . . . | |
| | MC:   Okay. Don't grab my arm. Jesus Bro. I don't give a f**k [Indiscernible] This school need to blow the f**k up. |
| OFFICER WRIGHT: | Say what? |
| MC: | The school need to blow up. |
| OFFICER WRIGHT: | Okay. |

2

| | |
|---|---|
| MC: | I didn't even say what? |
| DIRECTOR ELDERS: | What did he say Officer Wright? |
| OFFICER WRIGHT: | What did you say? |
| MC: | I said y'all need to leave me alone. |
| DIRECTOR ELDERS: | What did he say, Officer Wright? |
| OFFICER WRIGHT: | The school needs to blow up. |
| DIRECTOR ELDERS: | He needs to blow up, okay. |
| MC: | I didn't say I need to blow-- |
| DIRECTOR ELDERS: | Okay. There you go. |
| OFFICER WRIGHT: | All right. |

Officer Wright provided additional context, asserting that MC had been "very combative" in the administration office shortly before this incident; and that that "if you were actually there, you would really, really take what he said very seriously from what happened in the office and what happened down that hallway."

When asked during cross-examination to explain what he meant, Officer Wright clarified that when MC had been in Director Elders's office, he was combative, he used profanity, and his body language indicated he was not going to comply and go back to class and that they could not make him go. Officer Wright acknowledged that he grabbed MC's arm to lead him down the hallway, but he noted that MC did not put his fists up and "didn't threaten nobody," but he said he was "not going to f\*\*king class." MC made the comment about the school needing to blow up as they approached the door of the classroom. Officer

Wright said that when MC said it the second time, "that's when [he] knew there's something in his mind that he might come back and do something."

When defense counsel asked why he thought MC had made the threat, Officer Wright stated that it was "just in [his] mind, he's coming back to do something to this school with these students or this faculty." He did acknowledge that MC had just said "this school needs to blow up"; MC did not specifically state he was going to blow up the school—MC did not make a declarative "I" statement. Officer Wright also admitted that the second time MC made the statement, it sounded like it was in response to Officer Wright's asking him "say what?"—in effect, asking him to repeat what he had said. Although he testified that he thought MC would have said he was "just talking" if he had not meant it as a threat, Officer Wright conceded that he did not ask MC whether he meant what he had said. Officer Wright also acknowledged that while MC did not make the statement directly to him, he still "took it as a threat towards the school."

Officer Wright did not acknowledge MC's change in tone the second time he stated the alleged threat, but he did eventually admit that MC's tone did not affect how he interpreted the comment, and he repeatedly asserted that he felt threatened at the time it was made. Officer Wright never stated that MC was speaking directly to him or trying to make sure he heard him the first time he made the alleged threat. He did, however, acknowledge that no action was taken to make sure MC did not have a plan to carry out the alleged threat or otherwise cause harm to the school or its students.

Moreover, Officer Wright testified that he was not aware of MC's having a propensity for violence or threats and conceded that the statements might have been a suggestion of something MC might do at some point in the future. Officer Wright also acknowledged telling MC's mother, whom he knows socially, that he would not have arrested MC if he had known that she is his mother.

Director Elders testified that he has been the director of Focus Academy for ten years. He explained that Focus Academy is an alternative-learning-environment school for students with disciplinary issues. He confirmed that MC was a student at the school and that he had an encounter with MC on September 15, 2023, after a teacher had sent him to the office for refusing to do the class work. Director Elders noted that MC was angry when he came into the office, and due to MC's disrespect and refusal to follow instruction, he imposed a three-day suspension and told him to go to his next class. Because MC would not leave the office as instructed and continued to yell and be combative, Director Elders asked Officer Wright to escort him back to his class.

Director Elders testified that Focus Academy is an alternative school with a student population that sometimes exhibits behavioral challenges and bad attitudes like what he observed from MC that day. He noted that many of the students have problems controlling their anger and can get volatile and say things like "I'm going to shoot you, I'm going to kill you, I'm going to blow this school up." Director Elders testified, "I've got to take all of them seriously because if I come to school the next day and something happens and I didn't take it seriously, then that falls on me because I did not."

He opined that the second time MC made the alleged threat was in response to his question concerning what MC had just said. Director Elders also stated that he was not aware of any criminal or violent history with MC and confirmed that no investigative or safety-promoting steps were taken to determine whether MC had the plans or the capacity to actually do what he had said:

DIRECTOR ELDERS: I was trying to get clarification on just did I just hear him say what he said, and he said this school needs to blow up.

STATE: Right. Okay. Do you know to whom he was speaking?

DIRECTOR ELDERS: To me really, it didn't matter to whom he was speaking because of he was in school, and he made that statement, I'm assuming that he was making it about the school and everyone that was in it.

STATE: But do you think he was trying to communicate to anyone? I mean, do you think was he speaking to Officer Wright as far as you knew?

DIRECTOR ELDERS: No. I mean, I think in his anger—now, if you're asking me what I think. I think that in his anger he made a statement that he should not have made. He made a statement that he should not have made period, ever under any circumstances at a school.

STATE: But you don't think he was actually trying to say that to somebody?

DIRECTOR ELDERS: Are you asking me do I think that he was telling Officer Wright that I think this school needs to blow up? No. I think his statement was a general statement on what needs to happen to the school at that point in time in his anger.

At the close of Director Elders's testimony, the following exchange occurred:

6

DEFENSE COUNSEL:       So, did you take MC's statement, did you take him to intend to fill someone with intense fright?

DIRECTOR ELDERS:       I took his statement very serious with his state at the time, his anger level at the time. When he said it at the time, I took it serious that he was going to do something. So, I had to do what I needed to do to make sure that basically everyone at the school was okay.

DEFENSE COUNSEL:       And so as to what you thought his intent was, did you take it that he was intentionally trying?

DIRECTOR ELDERS:       At the time he said it, he said this school needs to blow up, so I figured that he was going to have something to do with that.

At the close of the State's case, MC's counsel moved for a directed verdict,[1] asserting that the State had produced no proof of a threat or of a communication of an intent to inflict harm. Defense counsel noted that he had not found an Arkansas case that held terroristic threatening to exist "where someone makes a comment of this nature about something that needs to happen without any grounding in expressing intent to do it himself." He argued that MC's comment was not directed at anyone in particular and that none of the evidence presented suggested that he had a propensity toward violence.

The State responded that the "general rule of thumb" is whether the person hearing the comment in question feels threatened and whether it is reasonable for the person to do so. The State noted that in this instance, both Officer Wright and Director Elders testified

---

[1]At the close of the evidence, MC moved for a directed verdict as opposed to a dismissal, which is the proper motion for challenging the sufficiency of the evidence at a nonjury trial. *See* Ark. R. Crim. P. 33.1 (2023); *see also, e.g.*, *Thornton v. State*, 2014 Ark. 157, at 4, 433 S.W.3d 216, 219.

that they felt threatened and felt that the school was at risk. The State also pointed out that the offense of terroristic threatening does not require a person to have the ability to carry out the threat; rather, the question is whether MC intended to cause them to fear that the school would be blown up.

The circuit court denied MC's motion, finding that an element of terroristic threatening is that the person hearing the threat must feel terrorized. The circuit court specifically relied on Officer Wright's and Director Elders's testimony regarding how MC's statement made them feel in determining that MC had committed the offense of terroristic threatening. The delinquency order was entered on October 17 (an additional delinquency order was entered on October 30 indicating related costs and fees owed during probation), and a timely notice of appeal was filed on November 15.

II. *Standard of Review*

MC challenges the sufficiency of the evidence supporting his delinquency adjudication.

> While a delinquency adjudication is not a criminal conviction, it is based on an allegation by the State that the juvenile has committed a certain crime. Our standard of review is the same as it would be in a criminal case, that is, whether the adjudication is supported by substantial evidence. Substantial evidence is evidence, direct or circumstantial, that is of sufficient force and character to compel a conclusion one way or the other, without speculation or conjecture. In considering the evidence presented below, we will not weigh the evidence or assess the credibility of witnesses, as those are questions for the fact-finder. The evidence is viewed in the light most favorable to the State.

*J.N.A. v. State*, 2017 Ark. App. 502, at 5, 532 S.W.3d 582, 586–87 (citations omitted). And when applying a criminal statute, we must also follow the rule of lenity—strictly construing

8

the penal statute and resolving any doubt about its meaning in a defendant's favor. *See Krol v. State*, 2018 Ark. App. 512, at 6, 563 S.W.3d 586, 589–90.

### III. *Discussion*

MC argues that the circuit court should have granted his motion to dismiss or otherwise not found him delinquent for having violated Arkansas Code Annotated section 5-13-301(a) (Repl. 2024), which states as follows:

> (a)(1) A person commits the offense of terroristic threatening in the first degree if:
>
>> (A) With the purpose of terrorizing another person, the person threatens to cause death or serious physical injury or substantial property damage to another person; or
>>
>>> (B) With the purpose of terrorizing another person, the person threatens to cause physical injury or property damage to a teacher or other school employee acting in the line of duty.
>
> (2) Terroristic threatening in the first degree is a Class D felony.

A person acts purposely with respect to his or her conduct when it is "the person's conscious object to engage in conduct of that nature or to cause the result[.]" Ark. Code Ann. § 5-2-202(1) (Repl. 2024). A defendant charged with terroristic threatening must intend to fill the victim with intense fright. *Ashmore v. State*, 2024 Ark. App. 506, at 12. Accordingly, the conduct prohibited by the statute is the communication of a threat with the purpose of terrorizing another person. *Stockstill v. State*, 2017 Ark. App. 29, at 5, 511 S.W.3d 889, 893.

MC does not specifically challenge the "communication" element; rather, he focuses on whether the State proved he made a threat with the requisite purpose under the statute.

MC initially argues that, as a legal matter, stating that one's school needs to blow up while walking away from an authority figure is not a threat. He acknowledges that neither the relevant statute nor Arkansas cases clearly define what is meant by "threaten" or "threat." He cites numerous cases from other jurisdictions and secondary sources as persuasive authority as to reasonable definitions that he asks this court to adopt. MC submits that none of them would support qualifying a statement of the nature that he made as a threat.

Although MC acknowledges that asserting that his school needs to blow up was a troubling sentiment, he submits that he did not remark what he or someone working in concert with him would do to the school. He maintains that he did not even direct the comment in the direction of Officer Wright, who was walking with him. *But see, e.g., Knight v. State*, 25 Ark. App. 353, 356, 758 S.W.2d 12, 14 (1988) (noting that the relevant statute does not require that the threat be communicated by the accused directly to the person threatened).

We note that as to the "threat" element of the offense, to satisfy First Amendment requirements, an alleged threat must constitute a "true threat." Arkansas has adopted the factors set forth in *United States v. Dinwiddie*, 76 F.3d 913 (8th Cir. 1996) to ascertain whether an alleged threat qualifies:

> Our supreme court addressed the issue of true threats in *Jones v. State*, 347 Ark. 409, 64 S.W.3d 728 (2002). There, it considered whether words contained in a rap song, in which the defendant threatened to kill a classmate and her family, constituted a "true threat." It concluded it did, after considering the five factors announced in *United States v. Dinwiddie*, 76 F.3d 913 (8th Cir. 1996). The five factors, while not exclusive, are (1) the reaction of the recipient of the threat and of other listeners; (2) whether the threat was conditional; (3) whether the victim had reason to

10

believe that the maker of the threat had a propensity to engage in violence; (4) whether the threat was communicated directly to its victim; and (5) whether the maker of the threat had made similar statements to the victim in the past. *Dinwiddie*, 76 F.3d at 925. The goal of the court is to conduct an objective analysis focusing on how a reasonable person would have taken the statement and using the *Dinwiddie* factors. *Jones*, 347 Ark. at 421, 64 S.W.3d at 736.

*Lilly v. State*, 2020 Ark. App. 88, at 4, 596 S.W.3d 509, 511. *Dinwiddie* adopted an objective test that focuses on how a reasonable person would have taken the statement and employs five factors for applying that test. *Id.* The United States Supreme Court, in considering what constitutes a "true threat" of violence, has held:

> The "true" in that term distinguishes what is at issue from jests, "hyperbole," or other statements that when taken in context do not convey a real possibility that violence will follow (say, "I am going to kill you for showing up late"). True threats are "serious expressions conveying that a speaker means to commit an act of unlawful violence."

*Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (citations omitted). The statement must be one that a reasonable person would have understood as a threat. *See id.* at 82.

MC asserts that a terroristic-threatening conviction requires that a defendant say what he or she will do or, in certain extreme situations, commit a physical act that conveys that the defendant intends to do something. He argues that his words and conduct did not rise to the level that would constitute a criminal threat and/or does not pass constitutional true-threat muster.

Although he acknowledges the testimony from Officer Wright and Director Elders that they took his comment seriously, MC claims their testimony supported a finding that he, at most, might have been generally disruptive at times—nothing suggested that they

11

believed or had reason to believe he had a propensity for violence. There was no evidence that demonstrated MC had made similar statements in the past, and it is undisputed that no action was taken by school officials to investigate whether he actually intended harm or presented any danger to the school, its students, and its employees.

Similarly, he argues that there was no evidence presented of an intent to terrorize; rather, the direction he was facing, his reaction when he realized that Officer Wright had heard him, and the other attendant circumstances weighed in favor of a conclusion that MC had no such intent. Accordingly, he urges that the adjudication should be vacated.

We disagree and note our supreme court's conclusion that "an objective test focusing on how a reasonable person would have taken the statement and using the *Dinwiddie* factors has the most merit." *Jones*, 347 Ark. at 421, 64 S.W.3d at 736. We hold that the record before us contains sufficient evidence to support the circuit court's finding that a reasonable person would have taken MC's statement as a true threat made with the purpose of terrorizing the school officials. Evidence of MC's angry and combative behavior and the loud volume of his voice indicating an intent to be heard supports Director Elders's testimony that he took the threat very seriously. Likewise, because MC was yelling, being physically and verbally combative, and willing to repeat his comment that the school needed to blow up, Officer Wright's concern was not unreasonable. He specifically stated that he felt the school, students, and staff were threatened and that he believed MC "was coming back to do something."

The circuit court had before it Director Elders's testimony that almost all the students at Focus Academy, including MC, were attending the alternative school because of disciplinary issues, and in that environment, threats from students were taken seriously. He explained that it was not unusual for students to respond to discipline with outbursts of anger; however, he also noted that it was rare for students to do more than mumble threats under their breath so they could not be heard. In contrast, MC's comment was not only loud enough for Officer Wright to hear him, but when asked, he repeated the statement without hesitation.

Given that MC's past disciplinary issues resulted in his attendance at Focus Academy and that he was combative and angry when he made the statement in question, when viewed in the light most favorable to the circuit court's finding of delinquency, we hold that substantial evidence supports the circuit court's finding that MC committed the offense of terroristic threatening. His statement that the school needed to blow up was sufficiently specific to constitute a threat because the statute does not require the threat to be explicit or even verbal. *See, e.g.*, *Foshee v. State*, 2014 Ark. App. 315, at 3 (noting that no precise words are necessary to convey a threat to injure a person; rather, it may be done by innuendo or suggestion as well as by blunt speech). Moreover, the State was not required to show that MC had the immediate ability to blow up the school. *See, e.g.*, *Knight*, 25 Ark. App. at 356, 758 S.W.2d at 14. And finally, we hold that the evidence before us—both in the form of the video recordings and the express testimony of Officer Wright and Director Elders—supports that the circuit court was not required to resort to speculation or conjecture in finding that

13

it was MC's conscious object to cause fear. *See, e.g.*, *Jackson v. State*, 290 Ark. 160, 162–63, 717 S.W.2d 801, 803 (1986) (noting that "by the nature of things, one's intent or purpose, being a state of mind, can seldom be positively known to others, so it ordinarily cannot be shown by direct evidence, but may be inferred from the facts and circumstances shown in evidence"). In considering the evidence presented below, we will not weigh the evidence or assess the credibility of witnesses since those are questions for the fact-finder. *See, e.g.*, *B.T. v. State*, 2019 Ark. App. 471, at 6, 588 S.W.3d 387, 392. Accordingly, we affirm the circuit court's adjudication of delinquency.

Affirmed.

ABRAMSON, TUCKER, and WOOD, JJ., agree.

THYER and BROWN, JJ., dissent.

CINDY GRACE THYER, Judge, dissenting. Today's majority opinion affirms a juvenile's adjudication for Class D felony terroristic threatening, holding that the State proved both that Minor Child (MC) communicated a true threat and that he had the purpose of terrorizing another person. I respectfully disagree on both points, and I therefore dissent.

I. *True Threat*

Regarding the existence of a threat, the majority correctly notes that in order to satisfy First Amendment requirements, an alleged threat must be a "true threat." And as set forth by the majority, Arkansas has adopted the approach to determining a "true threat" set out by the Eighth Circuit in *United States v. Dinwiddie*, 76 F.3d 913 (8th Cir. 1996). *See Jones v.*

14

*State*, 347 Ark. 409, 64 S.W.3d 728 (2002). *Dinwiddie* requires that we analyze an alleged threat "'in the light of [its] entire factual context' and decide whether the recipient of the alleged threat could reasonably conclude that it expressed 'a determination or intent to injure presently or in the future.'" 76 F.3d at 925 (internal citations omitted). The *Dinwiddie* court stated:

> When determining whether statements have constituted threats of force, we have considered a number of factors: the reaction of the recipient of the threat and of other listeners; whether the threat was conditional; whether the threat was communicated directly to its victim; whether the maker of the threat had made similar statements to the victim in the past; and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence. This list is not exhaustive, and the presence or absence of any one of its elements need not be dispositive.

*Id.* (internal citations omitted).

The *Dinwiddie* factors were applied in both *Jones*, *supra*, and *Lilly v. State*, 2020 Ark. App. 88, 596 S.W.3d 509. In *Jones*, a fifteen-year-old student wrote a set of violent song lyrics and gave them to a friend who had made him mad. The lyrics threatened to kill the friend and her family. The friend took the lyrics to the school principal and told him that she was scared because she thought Jones was capable of carrying out the threat described in the lyrics. Jones was subsequently convicted of terroristic threatening. Although Jones failed to preserve a challenge to the sufficiency of the evidence supporting his conviction, he also argued that the lyrics were constitutionally protected speech. This is the point on which the supreme court addressed the "true threat" issue and considered whether the lyrics actually constituted a threat. Adopting and applying the *Dinwiddie* factors, the court concluded that

15

they did. The court noted that the victim was "intensely frightened and upset" and immediately reported the incident to the principal. *Jones*, 347 Ark. 415, 64 S.W.3d at 732. The threat was not conditional; the threat was communicated directly to the victim when Jones handed her the note containing the lyrics; the victim believed Jones could carry out the threat, and she knew he had been in and out of juvenile detention facilities for various offenses. After thoroughly considering all the *Dinwiddie* factors, the court concluded that "[v]iewing these factors together, we conclude that a reasonable person in [the victim's] position would have taken the rap song as a true threat." *Id.* at 421–22, 64 S.W.3d at 736.

In *Lilly*, *supra*, the defendant, a former marine and a Veterans Administration patient, made a long post on the VA's Facebook page in which he stated, among other things, that "all v.a. employees are about as useful as tastebuds on an ass hole, fuck em all, kill em all and let God sort them out," and that "it looks to me like the v.a. isn't going to be happy until they've caused me to kill someone, preferably one of them, and if I knew an ISIS terrorist with a nuke, I'd pay them to burn the v.a. at 10 million degrees Fahrenheit." 2020 Ark. App. 88, at 2, 596 S.W.3d at 510. Someone at the VA headquarters in Washington, DC, saw the post and was concerned enough to report it to a special agent. The agent spoke to Lilly, explaining that because he is a veteran who had been trained how to shoot and kill people, his Facebook threats had to be taken seriously. Lilly told the agent he was just mad and venting and did not intend to hurt anyone. The circuit court nonetheless convicted him of terroristic threatening.

16

Again applying and analyzing the *Dinwiddie* factors, this court affirmed, citing Lilly's status as a former marine, his repeated statements about killing VA employees, and the agent's explanation that the threat was taken seriously because he was dealing with a veteran who was trained to shoot and kill people. "Viewing these factors together, we conclude that it was reasonable for the VA to take Lilly's statement as a true threat." *Id.* at 4, 596 S.W.3d at 511.

In determining whether there was a true threat in this case, we must conduct an objective analysis of the *Dinwiddie* factors. In my opinion, both the circuit court and the majority have failed as a matter of law by not conducting this analysis, instead merely concluding that the "record before us contains sufficient evidence to support the circuit court's finding that a reasonable person would have taken MC's statement as a true threat made with the purpose of terrorizing the school officials." While I agree that evidence was presented to the circuit court that would satisfy the first *Dinwiddie* factor--the reaction of the recipient of the threat and of other listeners--the "true threat" analysis cannot rest solely on that one factor. It is the failure to consider the remaining factors that requires reversal in my opinion.

Moreover, in analyzing MC's statement "in the light of its entire factual context," as we must pursuant to *Dinwiddie* and *Jones*, I cannot conclude that MC's statement constituted a "true threat." The Supreme Court has explained that the "'true' in that term distinguishes what is at issue from jests, 'hyperbole,' or other statements that *when taken in context do not convey a real possibility* that violence will follow." *Counterman v. Colorado*, 600 U.S. 66, 74

17

(2023) (emphasis added). True threats are "serious expressions conveying that a speaker means to commit an act of unlawful violence." *Id.* Thus, there must be some expressed, "determination or intent to injure presently or in the future." *Id.*

The statement or speech at issue here--"the school needs to blow up"--expresses neither determination nor intent to injure presently or in the future and therefore fails as a seminal matter under *Counterman*. Words matter, and while their effect on the listener has some relevance, the words themselves may not be regulated consistent with the First Amendment unless there is a determination or intent to injure. The statement at issue here is not a particularized statement of the speaker's intent to take any sort of action any more than a statement such as "this school needs to be blown up by a tornado." This conclusion is supported by Elders's testimony that it seemed as though MC was just saying words "in anger." While I can certainly recognize and understand his concern about failing to take MC's words seriously lest something actually happen, that is not enough, in my reading of our case law, to constitute a "true threat." And while I understand and appreciate our standard of review in every case, it cannot be used as a substitute for evidence of the factors required to be considered by the circuit court, nor can it be used for our own analysis. I simply do not think the appropriate analysis for determining a "true threat" was conducted here, and without it, I must dissent.

## II. *Purpose*

Moreover, even if it had been established that the statement was a true threat, the terroristic-threatening statute also requires that the State prove that it was MC's purpose to

18

terrorize another person.[1] This court explained the "purpose" element of first-degree terroristic threatening in *Knight v. State*, 25 Ark. App. 353, 758 S.W.2d 12 (1988). In that case, Knight was an inmate in the Pulaski County jail and had been overheard by a sheriff's deputy monitoring an intercom system saying that some of the deputies would not die of natural causes because he would be out of the pen someday. The deputy who overheard Knight's remarks testified that he considered the words a death threat and that he felt terrorized. Although Knight was convicted of terroristic threatening, this court reversed, explaining as follows:

> We agree with the State that the gravamen of the offense of terroristic threatening is communication, not utterance. The statute does not require that the threat be communicated by the accused directly to the person threatened. *Richards v. State*, 266 Ark. 733, 585 S.W.2d 375 (1979). There is no requirement that the terrorizing continue over a prolonged period of time. *Warren v. State*, 272 Ark. 231, 613 S.W.2d 97 (1981). Nor does the statute require that it be shown that the accused had the immediate ability to carry out the threats. *See Commonwealth v. Ashford*, 407 A.2d 1328 (Pa. Super. Ct. 1979). We do agree, however, with the statement of the court in *State v. Morgan*, 625 P.2d 951 (Ariz. Ct. App. 1981), that to be found guilty of threatening the defendant must intend to fill the victim with intense fright. Under our statute it is an element of the offense that the defendant act with the purpose of terrorizing another person, i.e., it must be his "conscious object" to cause fright.

> When we view the evidence in the light most favorable to the State, we find that the State established that appellant made the threatening statement, that the statement was perhaps sufficiently specific to constitute a threat to [the deputy], that appellant was aware that it was possible that his statement might be overheard, and that [the deputy] was, in fact, put in fear. While we are aware that one's purpose, like any other state of mind, is not ordinarily subject to proof by direct evidence, and must frequently be inferred from other facts, we do not think that the evidence in this case is sufficient to establish that appellant made the statement with the conscious object of terrorizing [the deputy], even if he was aware that he might be overheard. Statutes in other states impose criminal liability for threats made in reckless disregard of the

---

[1]The majority does not develop or expound on this issue.

risk of causing terror. *See, e.g., State v. Schweppe*, 237 N.W.2d 609 (Minn. 1975). Our statute does not.

25 Ark. App. at 356–57, 758 S.W.2d at 14.

Similarly, here, the State showed that MC made a threatening-sounding statement that was arguably made in "reckless disregard of the risk of causing terror." I do not believe, however, that the State proved that it was MC's conscious object to terrorize Wright, Elders, or the school in general. As noted above, Elders testified that it was a statement "made in anger" that MC should not have made. Neither Elders nor Wright actually gave a basis or a reason for believing MC might actually blow the school up. Neither had knowledge of MC's ever making a similar threat or that they knew he had been, for example, searching the internet for bomb-making instructions. Neither attempted to determine whether he had the capacity to actually blow up the school. Wright even added that he made the following statement to MC's mother, whom he knew socially: "[I]f I had known this was your kid . . . I wouldn't have arrested him."

I cannot find that the foregoing amounts to sufficient evidence that it was MC's conscious object to terrorize Elders and Wright. As noted in *Knight, supra*, Arkansas's terroristic-threatening statute does not impose criminal liability for threats made in reckless disregard of the risk of causing terror. While the State might have proved that MC made the statement, I cannot conclude that the proof satisfies the statutory requirement that it was MC's conscious object to terrorize Elders and Wright. *See Turner v. State*, 2010 Ark. App. 214, at 5 (reversing terroristic-threatening conviction based on statements that were made

20

while defendant was "very mad," and there was no evidence that it was his conscious object that his threat be communicated to the purported victim).

Although the majority defaults to the standard of review to uphold MC's delinquency adjudication, our standard of review should not be a substitute for evidence and should not be a substitute for analysis. I would therefore reverse.

BROWN, J., joins.

*The Law Office of Geoffrey D. Kearney, PLLC*, by: *Geoffrey D. Kearney*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Rebecca Kane*, Ass't Att'y Gen., for appellee.