Cite as 2024 Ark. App. 506

# ARKANSAS COURT OF APPEALS
### DIVISION IV
#### No. CR-24-23

| | | |
|---|---|---|
| EDDIE J. ASHMORE | | Opinion Delivered October 23, 2024 |
| | APPELLANT | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72CR-20-2574] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE MARK LINDSAY, JUDGE |
| | APPELLEE | AFFIRMED |

## RITA W. GRUBER, Judge

Eddie Ashmore was charged with second-degree domestic battering, first-degree false imprisonment, and first-degree terroristic threatening for events that occurred during several days of Thanksgiving week in 2020. He was tried before a jury and convicted of all charges. The circuit court sentenced him to six years' imprisonment for the domestic battering, three years' imprisonment for the false imprisonment, and three years' imprisonment for the terroristic threatening—the sentences to run consecutively. The victim of these crimes was his wife, Dorothy Ashmore.[1]

Eddie appeals his convictions and sentences from the court's September 22, 2023 sentencing order. He contends that (1) the evidence was not sufficient to support his convictions and (2) the circuit court erred in sentencing him to consecutive terms of

---

[1]Ms. Ashmore testified at trial that the parties divorced in October 2021.

imprisonment. We affirm.

## I. *Sufficiency of the Evidence*

The State's case-in-chief included testimony by officers of the Fayetteville Police Department, Dorothy Ashmore, and the Ashmores' adult daughter Laura, along with photos and documentation of Dorothy's physical wounds. Eddie's counsel moved for a directed verdict on all counts at the conclusion of the State's case. The motion was denied. Eddie then testified in his defense, and the defense rested. His counsel renewed his directed-verdict motion. Again, the court denied the motion.

A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Hughes v. State*, 2015 Ark. App. 378, at 6, 467 S.W.3d 170, 174. When reviewing the sufficiency of the evidence, we look at the evidence in the light most favorable to the State. *Id.* at 175. The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* Evidence is substantial when it is forceful enough to compel a conclusion and goes beyond mere speculation or conjecture. *Id.*

Under these standards, we address the sufficiency of the evidence. Officers Jon Haden and Christian Hurd testified that they responded to a disturbance-and-mental-distress call at the Ashmores' home the morning of November 28, 2020, the Saturday after Thanksgiving. Video footage from each officer's body camera was played for the jury. The officers encountered Eddie outside the home; he was belligerent and antagonistic, and told them that Dorothy was delusional. Her shoes lay on the grass in the front yard, and

2

she agreed that she was in a delusional state. The officers noted that Dorothy's left ring finger had blood on it and was "extremely blue-bruised," she had a bruised elbow and "blood on her lips and the area above her nose, and her hairline on her forehead was starting to bruise" and was slightly swollen. Dorothy was in distress and did not communicate well with the officers. She denied that Eddie had caused her injuries, saying that she was very sleepy and "probably did it to myself just because." She allowed the officers to come inside with her. They called for an ambulance, but she refused medical help. With nothing more they could do, the officers left Eddie and Dorothy at home and returned to their duties.

Officer Haydon spoke with Detective Scott O'Dell at the police department but went to the hospital after receiving a phone call that Dorothy was there. Laura had taken her mother to the hospital and was with her when Officer Haydon arrived. Dorothy spoke openly to him about what had happened, contradicting what she had told officers earlier—that she had caused her own injuries.

Detective O'Dell phoned Eddie the following Monday, November 30. Eddie said in their recorded conversation that Dorothy and he had been together for the four previous days and that she was delusional after having had COVID. Eddie said Dorothy told him she had participated in orgies in the past; had become pregnant by a friend of his; and had two abortions and fifty to sixty "infidelities," including with some females, during the Ashmores' previous ten years of marriage. He said she had held him hostage three days at Thanksgiving and physically blocked him from leaving. He said her bruises

and broken bones were from her falling or beating her head on the wall like her mother did, explaining that the two women had "the same mental disorder."

At trial, Dorothy testified that the following events occurred. The day before Thanksgiving, she and Eddie sat in a smoking area of their garage, and he began asking questions about people she had been intimate with: "He was accusing me of different people that I had been with, and . . . accusing me of being in orgies." He would set a five-minute timer on his phone; at five minutes he would "bing" a long paperclip against a metal ashtray and say, "Time's up, time's up. You didn't answer fast enough." Then he would go on to another form of question. This continued all day and all night. Laura was there at one point: she set a timer on her phone for five minutes and asked Dorothy about Dorothy's mother—who had died the year before. When Laura said she was leaving, Dorothy tried to keep her there because Eddie had stopped questioning her. Dorothy stood in the front doorway and tried to block Laura from going, but Laura eventually left. Eddie and Dorothy went into the living room to watch movies, then back to the garage where the questioning continued, then back to the den. Dorothy did not remember getting any sleep that night. The next morning, she and Eddie were back in the garage. She was smoking cigarettes and having coffee when he started the questioning again, asking about her past abortions and saying that he was not her husband. She testified that it was very confusing and very disorienting, and she became nervous and scared.

Dorothy was up again all through Thanksgiving night, watching movies in the den, being questioned by Eddie in the garage, and watching more movies. Around 2:30 a.m.,

he took her phone and resumed questioning her. He told her, "I'm going to take a hit off the bong, and by the time I'm done with inhaling, and when I exhale, you better have [your] answer ready." He asked about her "affairs" with fifty people and about orgies. Dorothy testified that "he asks a question, and he hits his bong, and he sits there, and then he breathes out, and he takes that metal paperclip that's in that metal ashtray, and he clinks it. And he says, 'Times up.'" He became increasingly aggressive in the questioning: his voice became louder, he gritted his teeth, and he continued questioning. He asked who Laura's dad was and "who was the person at the orgy." She told him there was no orgy, but he wanted names. He gave her pen and paper to write their names. He screamed out the name of a former employee from their business in a previous city.

At this point, Dorothy denied being with the man. There was no name to write, so she stood up. Eddie then struck her jaw with his closed fist "full impact," and she "went down to the garage floor." Eddie lifted her by her hair and said, "Maybe you'll remember the answers to these questions with a gun at your head." She could hear hair being ripped from her head. He let go of her hair, she "went to the ground" again, and he opened the garage door to go into the house. Most of their guns were locked in a safe, but she had hidden one in a chest days before. Thinking "I've got to get out of here" and hearing him yell "Where's my gun?" that he normally kept in the bedroom, she lifted herself up and "hit the garage door opener." She lay down, rolled under the door when it rose two to three feet, and ran toward the neighbors' home. She slipped in her backless shoes and fell in the grass but "got up quick because . . . I could still hear him hollering about his gun."

5

Dorothy ran and made it to the neighbors' yard, but Eddie tackled her from behind. She landed on her left arm, with Eddie on her back. He pulled her up by her left ring finger and told her to stop hollering. Dorothy described how he "got the forearm of my left arm, . . . so he is behind me, and he's got his arms under mine, and he's got ahold of my left arm. And his knees are, like, hitting my legs for me to walk." Dorothy further testified:

> And we're walking back toward our house, toward our driveway. And he's got me, and he's telling me to stop fighting back. You know, trying to get away. And just to go with him . . . . And he gets me to that truck, and that is when he pushes me up against the truck.

> And he turns me around, and we're facing one another. And he starts backing me toward . . . the entryway of the garage. . . . [W]e get to the back of my Avalon to, like, the trunk area. And that is when . . . he's got his arms under mine, walking me, and he just picked me up and threw me in between my car and that smoke area. And I ended up landing on the concrete on my back and slid. And my head hit—like, there's a recycle bin and some stuff there. My head ended up hitting that. That's what stopped me.

He again pulled her up by her hair, ripping more of it from her head and saying, "Maybe you'll know if I start ripping out your hair individually from your head." They went through the garage into the house and to the living-room area. He stood at one side of the coffee table, and she was on the other. He said, "I'm not going to kill you, Dorothy. . . . You're going to do that yourself." She told him, "I don't want to die. I don't want to die. I just want to know what's going on." He made a motion like he was going to come toward her, and he left the room to look for his gun. She tried to leave through the front door, leaving her shoes out front so she wouldn't trip. But "he was instantly there." They went

6

back into the house, where he threw her on a rug in front of the piano. She said that he was "on top of me . . . straddled me, facing me, and had both hands on the side of my head, and he picked my head up . . . just slams my head into [the laminate] floor about five or six times, and he was saying, 'I'm going to put my fist through your teeth and knock them down your throat.'" Next, he stood up and kicked her right thigh, and she lost consciousness.

When Dorothy regained consciousness, Eddie walked her into the kitchen and continued questioning her about alleged infidelities. At the kitchen counter, he gave her a piece of paper to write names on. She had been praying to Archangel Michael to protect her, so she wrote "Michael." Eddie wanted a last name: he grabbed her by the back of her head "with the hair underneath" and shoved her down toward the paper. She told him she didn't know a last name and needed a minute. She wrote a single letter and went around the kitchen island to the sink. He came around there and "got into" her face, placing his hands on her shoulders, spitting in her face, and grinding his teeth. He said, "If you don't give me that name, I'm going to put my fist through your teeth and knock them down your throat." He kept saying he wanted a last name. When they were by the refrigerator, he hit her face with his fist near her cheekbone, and she went to her knees. He kept threatening to knock her teeth down her throat.

In the den area, he backed her up to a large ottoman until she fell on it on her back, her legs hanging off of it. He "pulled out his dick and just started jacking off" all over the front of her clothes. She tried to get up, but he pushed her into a chair so hard it

moved two to three feet. Her back and legs were hanging off the chair, and he came at her with fist drawn. She braced her legs with her feet in the air, pushing him away. He tried to get her legs apart, hitting her leg and thigh, and saying he was "about to knock you the f*** out." He pushed her legs to one side and got face-to-face, saying, "I'm just going to knock your f***ing teeth through your throat. And if I miss and hit your nose, that's fine because I'll shove your nose up in your brain, and you'll just be dead." He grabbed her head and headbutted her forehead her four or five times, rolled her to one side, punched her "in the back in the kidneys," then rolled her "the other way" and punched her in the kidneys. Suddenly, he stopped; he calmly said he needed to take his medicine, and he walked to the back of the house to their bathroom.

Dorothy ran shoeless out the patio door into the backyard and to a nearby church, where she stood behind a magnolia tree for a while. She ran down a street to a parking lot but realized she had no phone and no way to contact anyone. It was daylight then. In panic and fear, she felt her only option was to return home. Around the side of the house, she encountered the police.

Laura testified that she was in and out of the house for a few days around Thanksgiving. On Saturday, she overheard Eddie asking Dorothy how she would explain her bruises. Laura made her presence known, told her parents she had come to get clothes, and asked Dorothy if she wanted to go get breakfast. Dorothy followed Laura to a bedroom but wouldn't go past the door. Laura saw the knot on Dorothy's forehead and noticed that some of her hair had been pulled out. Laura told her mother, "Go get your purse. We're

going to leave." Dorothy shook her head no, but Laura eventually was able to get her past Eddie in the kitchen and into Laura's car. Dorothy thanked her for "getting me out of there." Laura called her Aunt Cynthia, who advised her to take Dorothy to the hospital. The family's phones all had the tracking app Find My Friends, and Eddie arrived at the emergency room five minutes later. Laura told staff that Eddie was "the man that beat the shit out of my mother." He left the hospital and returned home before he went to stay with his parents in Tennessee.

The hospital documented Dorothy's extensive bruising, particularly to her finger, as well as a fractured toe, ankle, and elbow. Two weeks later, an orthopedist determined that her tailbone was fractured. Dorothy underwent physical therapy, wore a boot on her foot and a locking brace on her elbow for almost three months, and sat on a special pillow to relieve pressure on her tailbone.

Prior to going to her parents' home over the Thanksgiving weekend, Laura awoke to sixty-four missed phone calls and to find Eddie at her front door, demanding that she let him in to look for Dorothy. Laura took him to her next-door neighbor's apartment to talk while her husband slept. Laura testified that Eddie became "very angry" when she answered a phone call while they were there and "flipped a lit cigarette butt in [her] forehead." He then made rude, threatening comments and walked out, telling Laura that if she ever went against him again, he would dislocate her shoulders from her head and beat her "into glass until it broke."

Dorothy admitted in her trial testimony that she was not in her normal state of mind

at the time of Eddie's attack because of her bout with COVID and the recent death of her mother. She testified, however, that she was 100 percent confident that she had accurately described events surrounding the attack.

## A. Second-Degree Domestic Battering

A person commits second-degree domestic battering if, with the purpose of causing physical injury to a family or household member, the person causes serious physical injury to a family or household member. Ark. Code Ann. § 5-26-304(a)(1) (Repl. 2013). Ashmore contends that there was insufficient proof that he caused any injury to his wife because at the scene, she told officers that the injuries were self-inflicted and because his own physical disability and chronic pain prevented him from causing her injuries. He also argues that her physical injuries were not "serious." He notes that her tailbone fracture was not diagnosed until two weeks later and that she had no surgery or permanent marks from any of the injuries. The record belies Eddie's claim that her injuries were not serious.

Dorothy testified that Eddie punched her jaw and knocked her to the ground; pulled her up by ripping hair from her head; injured her elbow when he tackled her; lifted her by her ring finger, causing bleeding and bruising; threw her to the garage floor where she landed on her back and slid across the floor; straddled her and slammed her head to the floor; kicked her in the thigh; hit her in the face a second time, knocking her to her knees; and headbutted her four or five times before rolling her over and punching her repeatedly in her kidneys. Dorothy underwent physical therapy, and she wore a boot on her foot and a brace on her elbow as a result of her injuries. From this evidence, the jury

could determine that Eddie caused serious injuries to his wife.

## B. First-Degree False Imprisonment

A person commits first-degree false imprisonment "if, without consent and without lawful authority, the person knowingly restrains another person so as to interfere substantially with the other person's liberty in a manner that exposes the other person to a substantial risk of serious physical injury." Ark. Code Ann. § 5-11-103(a) (Repl. 2013). Eddie contends that the evidence was insufficient to prove false imprisonment because there was insufficient evidence that he interfered with her liberty or restrained her, and she was not precluded from leaving her house nor was she physically restrained in any way. He notes that she returned home after she initially left and again left with her daughter. He asserts that she had access to her phone when he gave it back to her and that their daughter came and went.

Dorothy testified that she tried to escape after Eddie first struck her with his fist, knocking her to the ground and then pulling her up by her hair. She fled through the garage door and ran to the neighbors' house, but she fell and he tackled her to the ground. He told her to stop fighting back when she struggled, and he forced her to return home, where he picked her up and threw her to the concrete floor of the garage. In the house, she again tried to escape when he began searching for his gun. He instantly forced her back inside, threw her down again, straddled her, and slammed her head into the floor. Then he stood and kicked her in the thigh, at which point she lost consciousness.

The false-imprisonment statute requires proof only that Eddie interfered

11

substantially with Dorothy's liberty in a manner that exposed her to a substantial risk of serious physical injury, not that he did so for a particular length of time or in any particular manner. There was ample evidence that Eddie caused serious injury to Dorothy, inflicting many of the injuries after forcing her to return home against her will. Thus, substantial evidence supports his conviction for first-degree false imprisonment.

### C. First-Degree Terroristic Threatening

A person commits first-degree terroristic threatening if with the purpose of terrorizing another person, the person threatens to cause death or serious physical injury to another person. Ark. Code Ann. § 5-13-301(a)(1)(A) (Supp. 2023). The defendant must intend to fill the victim with intense fright. *Hughes v. State*, 2020 Ark. App. 114, at 5, 596 S.W.3d 58, 61. A defendant's intent at the time of the offense can seldom be established through direct evidence; rather, "it must usually be inferred from the circumstances surrounding the crime." *Id.* (quoting *Armour v. State*, 2016 Ark. App. 612, at 3, 509 S.W.3d 668, 670). A jury is allowed to use its common knowledge and experience to infer a defendant's intent from the circumstances, and it is presumed that persons intend the natural and probable consequences of their acts. *Id.*

Ashmore contends the evidence was insufficient to prove that he committed first-degree terroristic threatening. He argues that he did not threaten Dorothy by pointing a gun at her and saying he would shoot, he never laid his hands on a gun or other weapon, and he told Dorothy that he was not going to kill her.

Use of a weapon is simply not an element of the offense. Dorothy testified that

Eddie said she might remember the answers he wanted if he put a gun to her head; that he would put his fist through her teeth to knock her teeth down her throat; that he would knock her "f***ing teeth" through her throat; and that if he hit her nose instead, he would shove her nose into her brain and she would be dead. The jury was free to presume that Eddie intended to fill Dorothy with fright, particularly because he was battering her when he made these statements, while threatening to cause her death or serious injury. This constitutes substantial evidence to support the conclusion that he committed first-degree terroristic threatening.

## II. *Consecutive Sentencing*

### A. Whether the Circuit Court Properly Exercised Its Discretion When It Imposed Consecutive Sentences

### B. Whether the Circuit Court Erred by Relying on Evidence Outside the Record

We discuss Eddie's arguments concerning these two subpoints together. Arkansas Code Annotated section 16-90-1112, titled "Victim impact statement," specifies that before imposing sentence, "the court shall permit the victim to present a victim impact statement concerning the effects of the crime on the victim, the circumstances surrounding the crime, and the manner in which the crime was perpetrated." Ark. Code Ann. § 16-90-1112(a)(1) (Supp. 2023). Eddie did not argue below that the court "failed to exercise discretion" in pronouncing consecutive sentences. Nor did he object to the court's considering Dorothy's letter as a victim-impact statement at sentencing. Thus, we do not address either subpoint. Furthermore, it is within a circuit court's discretion to order that

13

the sentences run consecutively. *Cherry v. State*, 2024 Ark. App. 249, at 8, 688 S.W.3d 164, 169 (citing Ark. Code Ann. § 5-4-403(a) (Repl. 2013)).

Affirmed.

BARRETT and MURPHY, JJ., agree.

*Lassiter & Cassinelli*, by: *Michael Kiel Kaiser*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Jason Michael Johnson*, Ass't Att'y Gen., for appellee.